UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:                                                          Case No. 16-14992-AJC

RICHARD DAVID SHAN,                                             Chapter 7

      Debtor.
_____/

JODI TARTELL, individually, and as a member of,                ADV. NO.:_____
HALLANDALE BEACH BUSINESS CENTER, L.L.C.,
suing derivatively on behalf of HALLANDALE BEACH
BUSINESS CENTER L.L.C., a Florida limited liability
company; and JO-RAN PROPERTIES, L.L.C., a Florida
limited liability company suing on its own behalf and
derivatively on behalf of
HIGHLAND PARK VENTURES, L.L.C., a Florida
limited liability company,

      Plaintiffs,
v.

RICHARD DAVID SHAN,

      Defendant.
_____/

## ADVERSARY COMPLAINT

Plaintiff, JODI TARTELL, individually, and as a member of HALLANDALE BEACH

BUSINESS CENTER, L.L.C., a Florida limited liability company, derivatively on behalf of

HALLANDALE BEACH BUSINESS CENTER, L.L.C and Plaintiff, JO-RAN PROPERTIES,

L.L.C., a Florida limited liability company, on its own behalf and derivatively on behalf of

HIGHLAND PARK VENTURES, L.L.C., a Florida limited liability company (collectively, the

"Plaintiffs") as creditors of the Debtor file this Adversary Complaint against Debtor, RICHARD

00380794.DOCX 4

DAVID SHAN to except the discharge of the Debtor's individual debt owed to the Plaintiffs pursuant to 11 U.S.C. § 523(a)(4), and allege as follows:

## PARTIES, JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J), and the Court has jurisdiction to enter a final judgment in this proceeding.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

4.      Plaintiff, Jodi Tartell ("Tartell"), is a resident of the State of Florida.

5.      Plaintiff, Hallandale Beach Business Center, L.L.C. ("HBBC"), is a Florida limited liability company duly organized in accordance with the laws of the State of Florida, with its primary place of business located in Hallandale Beach, Broward County, Florida.

6.      At all times material to the allegations herein, Tartell is and has been a seventy percent (70%) Member of HBBC.  Tartell is also a co-manager of HBBC.

7.      Plaintiff, JO-RAN Properties, L.L.C. ("JO-RAN"), is a Florida limited liability company duly organized in accordance with the laws of the State of Florida, with its primary place of business located in Hallandale Beach, Broward County, Florida.

8.      Highland Park Ventures, L.L.C. ("HP Ventures"), is a Florida limited liability company duly organized in accordance with the laws of the State of Florida, with its primary place of business located in Hallandale Beach, Broward County, Florida.

9.      At all times material to the allegations herein, JO-RAN is and has been a seventy percent (70%) member of HP Ventures.  JO-RAN is controlled by Tartell who is also a co-manager of HP Ventures.

10.     Debtor, Richard David Shan ("Shan"), is a resident of the State of Florida.  Shan is the other co-manager of HBBC and HP Ventures.

## ALLEGATIONS

### *Hallandale Beach Business Center*

11.     On November 20, 2006, BRSM Highland Park, Inc. ("BRSM") and SG-JT Properties, L.L.C. a Florida limited liability company ("SG-JT") formed the company, HBBC, for the purchase, sale and development or marketing of real property located in the City of Hallandale Beach, Florida.

12.     HBBC operates pursuant to the terms of an Operating Agreement (the "HBBC Operating Agreement) and Regulations (the "HBBC Regulations").   Copies of the HBBC Operating Agreement and HBBC Regulations are attached hereto as **Composite Exhibit "A."**

13.     Shan, through BRSM, held a thirty percent (30%) interest and Tartell, through SG-JT, held the other seventy percent (70%) percent in HBBC.

14.     In or about 2010, SG-JT transferred its seventy percent (70%) member interest in HBBC to Tartell.  Prior to the transfer, Tartell had been the majority member of SG-JT.

15.     Shan and Tartell were also appointed as and acted on behalf of HBBC as co-managers. But, Shan primarily handled the "books", wrote all the checks and authorized all wires as part of his daily duties for HBBC.

16.     By contrast, Tartell did not have "day-to-day" involvement with handling the books for HBBC.

17.     On November 20, 2006, HBBC, as payor, executed a promissory note in favor of the IG Family Limited Liability Limited Partnership, LLLP, a Florida limited liability limited

partnership ("IG Family LLLP"), as payee, in the principal amount of $3,400,000.00 (the "IG Family Note"). A copy of the IG Family Note is attached hereto as **Exhibit "B."**

18.     On December 3, 2006, HBBC, executed and delivered a mortgage (the "IG Family Mortgage") to secure the IG Family Note, recorded on December 18, 2006 in Official Records Book 43285, Pages 1443-1454 of the public records of Broward County, Florida. A copy of the IG Family Mortgage is attached hereto as **Exhibit "C."**

19.     On November 3, 2009, HBBC and the IG Family LLLP entered into a Note and Mortgage Modification Agreement (the "Modification"), extending the maturity date of the IG Family Note to December 3, 2012. The Modification was recorded on January 6, 2010 in Official Records Book 46780, Page 56 of the public records of Broward County, Florida. A copy of the Modification is attached hereto as **Exhibit "D."**

20.     In June, 2013, HBBC, as payor, executed a second promissory note in favor of The Joan Geduld 2002 Family Irrevocable Trust Dated June 11th, 2002 FBO Jodi Tartell (the "Trust"), as payee, in the principal amount of $3,536,054.32 (the "2013 Trust Note"). A copy of the 2013 Trust Note is attached hereto as **Exhibit "E."**

21.     The 2013 Trust Note was executed to replace the IG Family Note and to be collateralized by the IG Family Mortgage and the Modification.

22.     Shan, on behalf of HBBC, was responsible for making the interest payments under the 2013 Trust Note but failed to make all interest payments in 2013, 2014 and 2015, because HBBC did not have cash flow available.

23.     Shan knew that his failure to make interest payments would cause HBBC to default under either the IG Family Note and/or the 2013 Trust Note.

*Unauthorized Transfer(s)*

24.      Neither Shan nor Tartell had the power or authority to act on behalf of HBBC without the unanimous written consent of both members.

25.      In or about May, 2013, Shan acting under his authority as HBBC's co-manager, began taking money from HBBC without Tartell's consent and/or authorization.

26.      Specifically, between the dates of May 29, 2013 and July 10, 2014, Shan made several money transfers to himself masked as "cash distributions" and/or "shareholder loan withdrawals" from HBBC to Shanco Construction Company, Inc. ("Shanco"), a company solely owned and operated by Shan totaling $210,000 (the "Transfers"). The Transfers are detailed as follows:

| | |
|---|---|
| May 29, 2013 | $25,000.00 |
| July 26, 2013 | $25,000.00 |
| September 9, 2013 | $50,000.00 |
| November 12, 2013 | $50,000.00 |
| July 10, 2014 | $60,000.00 |
| | $210,000.00 |

27.      Shan recorded the Transfers in the books of HBBC as "shareholder loan account transactions" on behalf of BRSM.

28.      The Transfers Shan made were not for the benefit of HBBC but instead were being used for Shan's personal benefit and individual interests through Shanco.

29.      At no time did Shan receive Tartell's permission to use HBBC's proceeds for Shan's personal benefit and at no time did Tartell, either individually or through her entities, receive a distribution from HBBC.

30.      Pursuant to HBBC's Regulations, paragraph 6:

> Distributions. The Managers may, out of funds legally available therefore, at any regular or special meeting, declare distributions upon the Interests

of the Company as and when it deems expedient. Before declaring any distributions, there may be set apart, out of any funds of the Company available for distributions, such sum or sums as the Managers may, from time to time in its sole discretion, deem proper for working capital, or as a reserve fund to meet contingencies, or for equalizing distribution, or for such other purposes as the Managers shall deem conducive to the best interests of the Company. Initially, the Members agree to the following order of Distributions, in and when prudent and available: (a) payment of all invoices, mortgages and expenses as the same becomes due in the ordinary course of business (b) payment of interest of each Capital Account in the amount of twelve percent (12%) per annum, (c) return of each Member's Capital Account; and then finally, (d) to distribute any remaining monies as follows: (i) forty percent (40%) to the Members based upon their percentage ownership in the Company (e.g., BRSM Investments, Inc. 30% of the 40%: SG-JT Properties, L.L.C. 70% of the 40% and (ii) sixty (60%) to Richard Shan and Jodi Tartell on a 60/40 split basis. Richard Shan and Jodi Tartell may elect to have their income directed to a corporation or an LLC if they choose.

31.     Shan made the Transfers while Shan clearly knew that HBBC had insufficient operating capital, because Shan failed to make interest payments on the 2013 Trust Note and IG Family Mortgage in 2013 and 2014 due to HBBC's lack of cash flow in violation of paragraph 6 of the HBBC Regulations.

32.     Shan also knew that he was prohibited from paying distributions from HBBC when the 2013 Trust Note was not kept current in 2013 and 2014 but made the Transfers anyway in clear violation of paragraph 6 of the HBBC Regulations.

33.     Sometime after Shan made the Transfers, Tartell made a formal demand for Shan to produce HBBC's accounting records but Shan failed to produce the records.

34.     At or around the same time Shan failed to produce the accounting records for HBBC, Shan prepared and presented a detailed summary (the "Summary") to Tartell with HBBC's accounting records, *inter alia*, containing inaccurate financial information. A true and correct copy of the Summary is attached hereto as **Exhibit "F."**

35.     The Summary reflects that Shan improperly made the Transfers in his capacity as co-manager and failed to make proportionate distributions to Tartell in accordance with the HBBC Operating Agreement and the HBBC Regulations.

36.     Thereafter, on November 17, 2015, Tartell on behalf of HBBC, filed a complaint in state court against Shan for breach of fiduciary duty, *inter alia*, in Broward County case number CACE1502030394 to seek compensatory damages for the Transfers improperly made by Shan.

37.     Then, on April 6, 2016, Shan filed a Chapter 7 bankruptcy petition with this Court seeking a discharge of this debt owed to the Plaintiffs in the instant matter.

### *Highland Park Ventures*

38.     On August 8, 2006, BRSM and JO-RAN formed the company, HP Ventures, to develop townhomes for sale to the public at large in Hallandale, Florida.

39.     HP Ventures operates pursuant to the terms of an Operating Agreement (the "HP Ventures Operating Agreement") and Regulations (the "HP Ventures Regulations"). Copies of the HP Ventures Operating Agreement and HP Ventures Regulations are attached hereto as **Composite Exhibit "G."**

40.     Shan, through BRSM, held a thirty percent (30%) interest and Tartell, through JO-RAN, held the other seventy percent (70%) in HP Ventures.

41.     Shan and Tartell are co-managers of HP Ventures.

*Unauthorized Transfer(s)*

42.     In 2012, HP Ventures sold all of its assets and generated no business after the asset sale.

43.    Thereafter, Shan made an unauthorized transfer from the sales proceeds disguised as a "loan" or an "advance" from HP Ventures to Shanco totaling $597,296.34 (the "Advance").

44.    The Advance is reflected as a "Loan to Shanco" on the first page of the Summary under the section titled "Highland Park."  See Exhibit "F."

45.    Paragraph 6 of the HP Ventures Regulations provides as follows:

<u>Distributions.</u> The Managers may, out of funds legally available therefore, at any regular or special meeting, declare distributions upon the Interests of the Company as and when it deems expedient.  Before declaring any distributions, there may be set apart, out of any funds of the Company available for distributions, such sum or sums as the Managers may, from time to time in its sole discretion, deem proper for working capital, or as a reserve fund to meet contingencies, *or for equalizing distribution*, or for such other purposes as the Managers shall deem conducive to the best interests of the Company.  Initially, *the Members agree to the  following order of Distributions, in and when prudent and available:* (a) payment of all invoices, mortgages and expenses as the same becomes due in the ordinary course of business (b) payment of interest of each Capital Account in the amount of twelve percent (12%) per annum, (c) return of each Member's Capital Account; and then finally, *(d) to distribute any remaining monies as follows: (i) forty five percent (45%) to the Members based upon their percentage ownership in the Company (e.g., BRSM Investments, Inc. 30% of the 45%, Jo-Ran Properties, L.L.C. 70% of the 45%* and (ii) fifty five (55%) to Richard Shan and Jodi Tartell on a 60/40 split bases.  Richard Shan and Jodi Tartell may elect to have their income directed to a corporation or an LLC if they choose.

[Emphasis added]

46.    Shan knew that any net proceeds derived from the sale of assets for HP Ventures would have to be distributed amongst the Members proportionate to each Member's ownership interest.

47.    In fact, Shan's knowledge and comprehension of the protocol to distribute the sales proceeds for HP Ventures under the HP Ventures Regulations is evidenced by Shan's sworn testimony as follows:

Q. Okay. And a simple example, if you sold the property and received a net of $100 after whatever expenses, being the commission or attorneys or what have you, $100 would go into Highland Park, correct?

A. Correct.

Q. Now, Highland Park was owned in a similar structure, was it not, 70/30 between you and Ms. Tartell with whether it was personally or through an entity?

A. Correct.

Q. Okay.  So that $100 would be split, $70 going to Ms. Tartell and $30 going to you, correct?

A. In the way you're phrasing it, yes.

Q. Okay.  Was there anything wrong with what I just said?

A. No.  I think you're correct.

Q. Okay.  And instead, what you're telling me, for example, is that you took the $70 that Ms. Tartell might receive and advanced it to Shanco?

A. No. We took--we--we'd agreed that the other entities that needed money, that we didn't want to put any more money out our own--pockets and that we were going to lend money from Highland Park to the other entities.

Q. Well, help me out with--first of all, there is no document in writing that says this, correct?

A. I don't believe so.

Q. There is no e-mails that talk about this?

A. I'm not certain there are--if there are or there aren't.

Q. Would you agree with me from an accounting standpoint, you took almost $600,000 – I'm rounding up from 597, will you accept that, so if I use 600?

A. Yes.

Q. Okay.  You took $600,000 in sales proceeds that came into Highland Park and advanced or loaned that money to Shanco?

A. If the money was advanced to Shanco, yes.

Q. Okay.  And since 2012 Shanco has not paid back one single dollar of that approximate $600,000 to Highland Park; is that correct or incorrect?

A. Shanco has presented -- if you're asking me for actual cash that Shanco put back into Highland Park?

Q. I am.

A. The answer is no.

(Trans. of R. Shan, 95:25; 96:1-25; 97:1-18)

48.    Shan improperly made the Advance to Shanco in violation of paragraph 6, HP Ventures Regulations.  The Advance was not made for the benefit of HP Ventures but instead for Shan's personal benefit and individual interest through Shanco.

49.    At no time did Shan obtain Tartell's permission to use the HP Ventures's sales proceeds for Shan's personal benefit.

50.    Indeed, in an attempt to further disguise the Advance, Shan adjusted the HP Ventures accounting ledger to reduce the amount of money Shanco took from $597,296.34 to approximately $157,000.

51.    Thereafter, on January 13, 2016, JO-RAN on behalf of HP Ventures, filed a complaint in state court against Shan for breach of fiduciary duty, *inter alia*, in Broward County case number CACE16000621 to seek compensatory damages for the Advance improperly made by Shan.

52.    Then, on April 6, 2016, Shan filed a Chapter 7 bankruptcy petition with this Court seeking a discharge of this debt owed to the Plaintiffs in the instant matter.

53.    All conditions precedent to bringing this action have been waived or performed or have occurred.

## COUNT I
## OBJECTION TO DISCHARGEABILITY OF DEBT
## 11 U.S.C. § 523(a)(4)

54.     Plaintiffs incorporate and reallege paragraphs 1 through 53 as though fully set forth herein.

55.     Pursuant to § 523(a)(4), a discharge under section 727 does not discharge an individual debtor from a debt for defalcation while acting in a fiduciary capacity.

56.     Shan's debt, owed to the Plaintiffs, arises from his defalcation while Shan was acting in a fiduciary capacity as the co-manager of HBBC and HP Ventures.

57.     Shan, while acting in a fiduciary capacity as co-manager for HBBC and HP Ventures, violated his fiduciary duty and committed defalcation by consciously disregarding the HBBC Regulations and the HP Ventures Regulations and improperly distributing the Transfers from HBBC and the Advance from HP Ventures to Shanco for Shan's personal interest and sole benefit.

58.     Accordingly, the debts owed to the Plaintiffs are not dischargeable pursuant to 11 U.S.C. § 523(a)(4) as a result of the acts described herein.

WHEREFORE, the Plaintiffs, Jodi Tartell, individually, and as a member of Hallandale Beach Business Center, L.L.C., derivatively on behalf of Hallandale Beach Business Center, L.L.C., and JO-RAN Properties, L.L.C. on its own behalf and derivatively on behalf of Highland Park Ventures, L.L.C., respectfully requests that this Court enter a judgment denying the dischargeability of the Debtor, Richard David Shan's, debt to the Plaintiffs for defalcation while acting in a fiduciary capacity, and granting such other and further relief as this Court deems just and proper.

Dated: January 26, 2017

Respectfully submitted,

BAST AMRON LLP
*Counsel for Plaintiffs*
SunTrust International Center
One Southeast Third Avenue, Suite 1400
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile: (305) 379-7905
Email: jbast@bastamron.com
Email: hharrison@bastamron.com

By:  */s/ Jeffrey P. Bast*
      Jeffrey P. Bast, Esq. (FBN 996343)
      Hayley G. Harrison, Esq. (FBN 105157)

# Composite Exhibit "A"

# OPERATING AGREEMENT
## FOR
## HALLANDALE BEACH BUSINESS CENTER, L.L.C.
## A FLORIDA LIMITED LIABILITY COMPANY

THIS AGREEMENT, entered into this 20th day of November, 2006, by and among BRSM Investments, Inc., a Florida corporation, and SG-JT Properties, L.L.C., a Florida limited liability company (collectively the "Members").

## W I T N E S S E T H :

### PREAMBLE

WHEREAS, the Members have represented and warranted to each other that they have experience in and capability of acquiring, managing, leasing, renting, operating and selling real property; and

WHEREAS, the Members are desirous of entering into a business venture for the purchase, sale and development or marketing of real property located in the City of Hallandale Beach, County of Broward, State of Florida (the "Land") and other lands; and

WHEREAS, the parties have formed a Florida limited liability company pursuant to Chapter 608 of the Florida Statutes, as amended, with the initial Members of said Company being BRSM Investments, Inc., a Florida corporation, and SG-JT Properties, L.L.C., a Florida limited liability company.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and in consideration of the mutual promises, covenants and conditions contained herein and other good and valuable considerations, the sufficiency and receipt of which are hereby acknowledged by each of the parties hereto, it is agreed as follows:

## ARTICLE I
### The Company

1.1  Name.  The name of the Company is Hallandale Beach Business Center, L.L.C.

1.2  Duration.  The Company shall continue until dissolved as provided in Article X.

1.3  Purpose.  The purpose of the Company shall be to engage in any lawful business, as the Members shall determine.

1.4  Location.  The principal office of the Company shall be at such place as the Members shall determine.  Its initial office in Florida shall be at 20141 N.E. 21st Avenue, Miami, Florida 33179.

1.5    Capital. The Members shall contribute to the Capital of the Company as provided in Article II.

1.6    Additional Capital. The Members may make such additional capital contributions at such time as the Members shall determine as provided herein.

1.7    New Members. The right, if given, of the remaining Members to admit additional Members and the terms and conditions of the admissions shall be as follows: new Members may be admitted from time to time, and upon such terms and conditions, as shall be determined by a unanimous vote of the Members.

1.8    Continuation. Upon a Member's death, insanity, withdrawal, bankruptcy, assignment for the benefit of creditors of any other act causing a dissolution of the Company as set forth in Section 10.01, the Company may be continued with the consent of the Members as provided in Section 10.02.

1.9    Managers. Richard Shan and Jodi Tartell are appointed as the initial Managers ("Managers") of the Company and shall serve in such capacity until the next annual meeting of the Members or until resignation, if earlier. The Managers shall have the duties, authority and responsibilities all as set forth in the provisions of Section 3.5.

1.10    Powers. The Company shall have all powers granted or permitted by law, including but not limited to the power to purchase and sell real estate, borrow money or otherwise obtain credit in such amount and on such terms as the Company deems appropriate, to make, execute and deliver any instruments, loan agreements, notes, drafts and acceptances on behalf of the Company, and to execute any mortgages, security agreements, financing statements, instruments of assignment and any other instruments or documents that may be necessary to collateralize any such borrowings.

1.11    Preamble. Each of the parties hereto does hereby reaffirm the statements, representations and warranties contained in the foregoing preamble, and such preamble is hereby incorporated by reference into this Agreement.

1.12    Limited Liability Company. The Articles of Organization for a limited liability company to be formed pursuant to Chapter 608 of the Florida Statutes (1989), as amended, have been previously executed. The interests of the Members shall be as follows, subject to the performance by each of the parties hereto to the agreements and covenants set forth herein:

| MEMBER | INTEREST |
| --- | --- |
| BRSM Investments, Inc. | 30.00% |
| SG-JT Properties, L.L.C. | **70.00%** |

## ARTICLE II
## Capital Accounts and Limited Liabilities

2.1     Initial Contributions.    Each of the Members shall be responsible for its proportionate share of the capital contribution to the Company.    In addition, each of the Members shall, from time to time, contribute additional amounts as the Members determine are necessary and are approved by unanimous vote of the Members.

2.2     Capital Accounts.    A Capital Account shall be maintained for each Member pursuant to U.S. Code §704(b) and the Regulations thereunder.

2.3     Loans.    In the event any Member advances any sums of money to the Company in excess of the capital contributions from time to time agreed upon by the Members, such sums shall be recorded on the books of the Company as a loan from the Member who makes such advances, on such terms as determined by the parties, and the same shall constitute a liability of the Company at the time such advance is made.

## ARTICLE III
## Administrative Policies

3.1     Voting.    Except as otherwise expressly provided in this Agreement, all determinations affecting the conduct of the affairs of the Company shall be made by a majority vote of the Members.  Each Member shall be entitled to one vote for each interest which each Member has in the Company.

3.2     Bank Accounts.    All funds of the Company may be deposited in its name in such checking account or other bank accounts as shall be designated in writing by the Managers. Withdrawals shall be on such signatures as may be agreed upon in writing by the Managers from time to time.

3.3     Restrictions on Members.    No Member shall have the power or authority to take any acts on behalf of the Company without the unanimous written consent of the Members.

3.4     Assumption of Liabilities.    The Company shall assume only those specific liabilities as contemplated by those certain Contracts for Sale and Purchase (the "Contracts"), as follows:

(a)     BRSM Investments, Inc., as Buyer ("Assignor") and Leonard Grand, as Trustee of the Joslyn Moffitt Perkins Trust, as Seller ("Seller"), dated August 10, 2006, as may be amended from time to time, which Contract was assigned by Assignor to Hallandale Beach Business Center, L.L.C.,

–3–

with regard to the purchase the Land more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Property").

(b)     BRSM Investments, Inc., as Buyer ("Assignor") and Ignacio E. Sanchez, a single man, as Seller ("Seller"), dated November 9, 2006, as may be amended from time to time, which Contract was assigned by Assignor to Hallandale Beach Business Center, L.L.C., with regard to the purchase the Land more particularly described on Exhibit "B" attached hereto and made a part hereof (the "Property").

None of the Members shall have any personal liability or responsibility whatsoever excepting only those liabilities specifically assumed by them.

3.5     Responsibilities of Managers.  The Managers shall be responsible for the day-to-day operations of the Company and shall use their reasonable efforts to carry out the purposes and business of the Company.  The Managers shall have the right to delegate their duties and responsibilities relating to the day-to-day operations of the Company's business to its officers as set forth herein and in the Regulations, provided that the Managers shall remain responsible for such operations and the implementation of decisions made by the Members with respect to the Company business.  All financial aspects of the business of the Company shall be managed and directed by the Managers.   This managerial right shall apply to the appointment of all accountants, bookkeepers, auditors, legal counsel, and shall include the decisions of borrowing money, obtaining bank financing, signing checks and otherwise making arrangements for the working capital to meet the business objectives and budgetary needs.  Notwithstanding anything to the contrary contained herein, if more than one Manager is serving and any Manager fails to attend a Managers' meeting after having received adequate advance written notice thereof, the remaining Manager is authorized to act in the absence of such absent Manager, despite the lack of a quorum, as to all matters properly before the meeting.

## ARTICLE IIIV
### Indemnification

4.1     Acts and omissions.  The Company shall indemnify and save harmless (but only to the extent of Company assets) the Managers and each Member against any claims or liabilities incurred by such Manager or Member arising out of or related to the business of the Company provided that the acts or omissions giving rise to such claims or liabilities were performed in good faith in the belief that such Manager or Member was acting within the scope of its, his or her authority under this Agreement, except that no Manager or Member shall be indemnified with respect to loss or claim by reason of gross negligence, willful misconduct or breach of a fiduciary duty to the Company.

4.2    <u>Guarantees.</u>    In the event that any Member guarantees or incur loans or obligations, in the normal course of business, on behalf of the Company or guarantee any leases on behalf of the Company or makes loans to the Company pursuant to proper corporate authority, or is owed money by the Company for services rendered pursuant to proper authority, and in the event that such Member is required to make payment pursuant to such obligation (including any costs, interest, penalties and attorneys' fees), then any such Member obligated upon such debt shall be entitled to a prorata indemnification for the payment of a proportional share of the debt from each and all other Members, but only to the extent of their respective percentage of ownership interest in the Company as of the date on which the personal guarantee of the relevant obligation was created.  However, in the event that the indemnitee hereunder is unable to obtain a prorata contribution from a person or entity responsible hereunder, but is no longer a Member at the time that claim for indemnity is made, the indemnitee shall have the right to recover as against any individual or entity who has succeeded to the interest in question, and that person shall in turn have the right to recover as against such Member's transferor, unless liability for such matters has otherwise been allocated between them.

4.3    <u>Pledge.</u>    All Members signing this agreement and all those acquiring an interest subject to the terms of this agreement are personally responsible for the indemnity provisions as set forth in this paragraph.  Each further agrees that there shall be a pledge of and a security interest in a Member's interest in the Company to secure the indemnity provided for in this paragraph, and that each shall execute all documents required to perfect such interest.

**ARTICLE V**
**<u>Disagreement Among Members</u>**

In the event differences develop between any of the Members, the parties agree to submit the dispute to an independent mediator.  In the event the parties are unable to agree upon a mediator within ten (10) days or in the event the mediator is unable to resolve the dispute, then in such event, any Member ("Offeror") may offer to any other Member ("Offeree"), in writing, to purchase all of the ownership interest of the Offeree upon specific terms, conditions and price. The Offeree, upon receipt of the offer, must then elect, in writing, within thirty (30) days, to either accept the offer and sell the interest to the Offeror, or otherwise to purchase the interest of the Offeror upon the same terms, price and conditions, in which event the Offeror shall be obligated to so sell to the Offeree upon those terms, conditions and price.

**ARTICLE VI**
**<u>Closing</u>**

Unless otherwise agreed by the parties, the closing of the sale and purchase of an interest in the Company shall take place at the offices of the Company's attorney.  In the case of any purchase of an interest hereunder, the closing of the sale and purchase shall take place within

−5−

sixty (60) days after the notice date, except that if a Member has died or become incapacitated and a personal representative, guardian or trustee of such Member's estate has not then been appointed, then the closing shall take place within thirty (30) days after the appointment, whichever is later, but in no event shall it be more than one hundred twenty (120) days from the date of the notice. Upon the closing of the sale and purchase, the selling and purchasing parties shall execute and deliver to each other the various documents that shall be required to carry out their undertakings hereunder. In addition, the selling Member shall deliver to the Company his, her or its resignation and that of his, her or its nominees, if any, as Manager, employee and/or officer of the Company.

**ARTICLE VII**
**Company Records**

Each Member shall have access to the books and records of the Company at any time prior to the occurrence of an event requiring that his, her or its interest be purchased.

**ARTICLE VIII**
**Withdrawal or Retirement of a Managers**

A Manager may withdraw or retire from the Company at any time, by written notice to each Manager and Member.

**ARTICLE IX**
**Laws of Descent; Right of First Refusal; Assignment**

9.1    Laws of Descent.    Notwithstanding anything herein to the contrary, upon the death of a Member or Assignee (as provided in Section 9.3), a transfer pursuant to devise, or where applicable, the laws of intestacy, shall be deemed a transfer with the consent of the Members. One who is a transferee pursuant to this Section 9.1 below shall become an Assignee as provided in Section 9.3 below. Notwithstanding anything herein to the contrary, if a Member's interest passes to his or her spouse and/or children through devise or the laws of intestacy, where applicable, the spouse and/or such children shall become Members of the Company.

9.2    Right of First Refusal.    In addition to the other limitations and restrictions set forth in this Article IX, except as permitted by Section 9.1 hereof, no Member shall transfer all or any portion of such Member's interest (the "Offered Interest") unless such Member (the "Seller") first offers to sell the Offered Interest pursuant to the terms set forth as follows:

(a)    No transfer may be made under this Section 9.2 unless the Seller has received a bona fide written offer (the "Purchase Offer") from a party (the "Purchaser") to purchase the Offered Interest for a specified purchase price (the "Offer Price") payable at closing

–6–

or according to specified terms, which offer shall be in writing signed by the Purchaser and shall be irrevocable for a period ending no sooner than the day following the end of the Offer Period, as hereinafter defined.

        (b)     Prior to making any transfer that is subject to the terms of this Section 9.2, the Seller shall give to each other Member written notice (the "Offer Notice") which shall include a copy of the Purchase Offer and an offer (the "Firm Offer") to sell the Offered Interest to the other Members (the "Offerees") for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer, provided that the Firm Offer shall be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Interest) to be provided by the purchaser for any deferred portion of the Offer Price.

        (c)     The Firm Offer shall be irrevocable for a period (the "Offer Period") ending at 11:59 P.M. local time, at the Company's principal place of business, on the thirtieth (30th) day following the day of the Offer Notice.

        (d)     At any time during the Offer Period, any Member may accept the Firm Offer as to all or any portion of the Offered Interest, by giving written notice of such acceptance to the Seller which notice shall indicate the maximum interest that such Offeree is willing to purchase. In the event that more than one Member accepts the Firm Offer, each such Member shall have the right to purchase a prorata portion of the Offered Interest equal to such Member's interest at the time of acceptance of the Firm Offer. In the event that the Firm Offer is accepted, the closing of the sale Offered Interest shall take place within thirty (30) days after the Firm Offer is accepted.

    9.3     Assignee. An Assignee, under this Article IX or pursuant to Article V, shall not be entitled, during the continuance of the Company, unless admitted as a new Member, to interfere in the management or administration of Company business or affairs or to bind the Company or any Member in any manner whatsoever or to vote with respect to any Company act, decision or determination. An Assignee or the Assignee's duly authorized legal representative may inspect the Company books during normal business hours and upon reasonable notice to the Company. As Assignee shall succeed to the Capital Account of the deceased Member (or permitted Assignee) and shall receive the share of profits, losses and distributions of cash or other property to which the assigning Member or Assignee of the deceased Member would have been entitled under this Agreement. In determining if the vote of the Members is obtained with respect to a Company act, decision or determination, an Assignee shall not be considered or counted as a Member, unless the Assignee is already a Member. In such event, the Member is only entitled to one vote.

## ARTICLE X
### Dissolution

10.1    <u>Termination.</u>  The Company shall dissolve and terminate upon the first to occur of the following events:

(a)    The agreement of the Members to terminate the Company.

(b)    If a Member makes an assignment for the benefit of creditors, files a petition in bankruptcy, is adjudicated insolvent or bankrupt, petitions or applies to any tribunal for a receiver or a trustee of any substantial part of his or its properties; or any Member commences any proceeding under any reorganization, arrangement, readjustment of debts, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect.  Notwithstanding this requirement, the remaining members may vote to continue the business if only one Member files for bankruptcy or is adjudicated insolvent.

( c)    There is commenced against any Member any proceeding described in the preceding subparagraph (b) and such Member fails to file a proper answer thereto pursuant to applicable law, or any act indicates Member's consent to, approval of or acquiescence in any such proceeding or the appointment of any receiver of or trustee for such Member or any substantial part of such Member's property; or any Member suffers any such receivership or trusteeship to continue undischarged for a period of sixty (60) days; or any governmental agency or instrumentality seizes, appropriates, condemns, occupies or interferes in any manner with any Member's operation of all substantial portion of such Member's property.

(d)    The liquidation or dissolution of a Member which is a corporation, but only if the remaining Members elect to treat such event as a dissolution of the Company.

10.2    <u>Continuation of Company Business.</u>  Notwithstanding the provisions of Section 10.1 above, in the event of a dissolution, bankruptcy, insolvency or other event relating to a Member (the "Terminated Member") causing a dissolution and termination of the Company pursuant to subparagraphs (b), (c), or (d) of Section 10.1 above, the other Member(s) (the "Remaining Members") by a majority vote shall have the right, at his, her or their option, to continue to conduct the Company business under the Company's name, and the successor in interest to the interest of the Terminated Member shall become an Assignee within the meaning of Section 9.3 of this Agreement.

–8–

10.3    <u>Winding Up.</u>    Upon a dissolution and termination of the Company, unless continued by the Remaining Member in accordance with the provisions of Section 10.2, the Company property shall be liquidated as soon as practicable, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order:

(a)    To the payment and discharge of all of the Company's debts and liabilities (other than those to the Members) including the establishment of any necessary reserves;

(b)    To the payment of any debts and liabilities to the Members;

(c)    To the payment of a twelve percent (12%) interest on the positive balance of each Member's Capital Accounts;

(d)    To the Members in accordance with the positive balances in their Capital Accounts.

(e)    Any remaining income as follows: (i) forty percent (40%) to the Members based upon their percentage ownership in the Company (e.g., BRSM Investments, Inc. 30% of the 40%; SG-JT Properties, L.L.C. 70% of the 40%; and (ii) sixty percent (60%) to Richard Shan and Jodi Tartell on a 60/40 split basis. Richard Shan and Jodi Tartell may elect to have their income directed to a corporation or an LLC if they choose.

### ARTICLE XI
### Miscellaneous

11.1    <u>Miscellaneous Items.</u>

(a)    This agreement may be amended at any time upon the unanimous approval of the of the Members; provided, however, that Sections 1.7, 2.1, 3.3 and 9.1 shall be amended only with the written unanimous consent of the Members.  All amendments shall be in writing.

(b)    This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns.

( c)    Whenever any words are used herein in the masculine gender, they shall be construed as though they were also used in the feminine gender in all cases where they would so apply; and whenever any words are used herein in the singular form, they shall be construed as though they were also used in the plural form in all cases where they would so apply.

(d)    The laws of the State of Florida shall govern and be effective with respect to the formation of the Company, the rights, duties and obligation arising therefrom and the liability of the members.  In the event that any provision of this agreement shall be held to be invalid, the same shall not affect in any respect whatsoever the validity of the remainder of this agreement.

(e)    To the extent that the provisions of this agreement may be in conflict with provisions of any other agreements between one or more of the parties, with the Regulations or with the Articles of Organization, then the terms of this agreement shall be considered superior and shall supersede in all respects.

(f)    No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder upon any default by another party hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy by a party preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

(g)    This agreement may be executed in any number of counterparts.

(h)    The giving of notice to any Member shall be at the address listed beside his, her or its name and signature below.  All notices shall be by telefax or by certified return receipt mail, and the address for notice may be changed in a like fashion.

(i)    In the event of a dispute with reference to this agreement, whether litigated, mediated or arbitrated, the prevailing party shall be entitled to reasonable attorneys' fees to be determined.

(j)    The invalidity or unenforceability of any provision of this agreement shall not affect the validity or enforceability of the remaining provisions.

(k)    <u>Contractor Agreement.</u>    Upon signing this Agreement, the Managers shall enter into a Contractor's Agreement with Shanco Construction Company (the "Contractor's Agreement") for an amount to be determined once the scope of the project is agreed upon.

IN WITNESS WHEREOF, the Members and Managers hereto have executed this agreement as of the day and year first above written.

WITNESSES:

Signature of First Witness

Printed Name of Witness

Signature of Second Witness

*Erica Smolyansky*

Printed Name of Witness

Managing Members:

BRSM Investments, Inc.,
a Florida corporation

By: _____

    Richard Shan, President
    20141 Northeast 21st Avenue
    Miami, Florida 33179


SG-JT Properties, L.L.C.,
a Florida limited liability company

By: _____

    Jodi Tartell, Manager
    655 Hibiscus Drive
    Hallandale Beach, Florida 33009

## Schedule A

LOTS 1 THROUGH 5, AND LOT 19, LESS THE NORTH 10 FEET, & LOT 20, BLOCK 30, OF THE PLAT OF THE TOWN OF HALLANDALE, AS RECORDED IN PLAT BOOK "B", PAGE 13 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, SAID LAND SITUATE, LYING AND BEING IN BROWARD COUNTY, FLORIDA.

## Schedule B

Lot 6, in Block 30, TOWN OF HALLANDALE, according to the Plat thereof, as recorded in Plat Book "B", Page 13, of the Public Records of Miami-Dade County, Florida, said land situate lying and being in Broward County, Florida.

**REGULATIONS**
**OF**
**HALLANDALE BEACH BUSINESS CENTER, L.L.C.,**
**A FLORIDA LIMITED LIABILITY COMPANY**

1.   Offices. The principal office of the Company shall be established and maintained at 20141 N.E. 21st Avenue, Miami, Florida 33179, in the County of Miami-Dade, State of Florida. The Company may also have offices at such places within or without the State of Florida as the Managers may from time to time establish.

2.   Members.

   a.   **Annual Meeting.** The annual meeting of the Members of this Company shall be held on the first Monday of January of each year, or at such other time and place designated by the Managers of the Company. Business transacted at the annual meeting shall include the election of Managers of the Company and all other matters properly before the Managers. If, in any year, the election of Managers is not held at the annual meeting of the Members of the Company, the Managers shall call a special meeting of the Members as soon thereafter as reasonably possible for the purpose of holding such election and transacting such other business as may be properly brought before the meeting. In the event the Managers fail to call a special meeting within two (2) months after the date prescribed for the annual meeting, any Member may call such a meeting, and at such a meeting the Members may elect Managers and transact all other business properly brought before the meeting.

   b.   **Special Meetings.** Special meetings of Members may be called for any purpose. Special meetings of the Members shall be held as directed by the Managers, or when requested in writing by the holders of not less than ten percent (10%) of all the Interests entitled to vote at the meeting. A meeting requested by Members shall be called for a date not less than ten (10) nor more than sixty (60) days after the request is made, unless the Members requesting the meeting designates a later date or except in the case of an emergency. The call for the meeting shall be issued by the Managers, unless Members requesting the meeting shall designate another person to do so.

   c.   **Action By Written Consent In Lieu of Meetings.** Any action required or permitted by law to be taken at a meeting of the Members of the Company may be taken without a meeting, without prior notice, and without a vote, if a consent, in writing, setting forth the action so taken, is signed by the holders of outstanding interests having not less than the minimum number of votes that would be necessary to authorize or take such an action at a meeting at which all interests entitled to vote thereon were present and voted.

   d.   **Place of Meetings.** Meetings of Members shall be held at the principal place of business of the Company, or at such other place as may be designated by the Managers.

   e.   **Notice of Meeting.** Written notice to each Member entitled to vote, stating the location, date and time of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting. If any Member shall transfer such Member's Interest in the Company after notice, it shall not be necessary to notify the transferee. Any Member may waive notice of any meeting either before, during or after the meeting.

   f.   **Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of the Members of the Company, or to receive company distributions, or in order to make a determination of Members for any other proper purpose, the Managers may provide that the transfer books be closed for a stated period of not less than ten (10) nor more than sixty (60) days in duration. In lieu of closing the transfer books, the Managers may fix, in advance, a date as the record date for the determination of Members for any of the purposes enumerated above. Such date shall not be less than ten (10) nor more

than sixty (60) days in duration. If the transfer books are not closed and the record date is not fixed for the determination of Members entitled to notice of or to vote at a meeting of the Members of the Company entitled to receive distribution, the date on which the notice of the meeting is mailed or the date on which the resolution of the Managers declaring the distribution is adopted, as the case may be, shall be the record date for such determination.

g.    **Quorum.** The majority of the Members (and not Interests) then outstanding and entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of Members, but in no event shall a quorum consist of less than one hundred percent (100%) of the outstanding Members entitled to vote at the meeting. After a quorum has been established at a Members meeting, the subsequent withdrawal of Members, so as to reduce the number of Interests entitled to vote at the meeting below the number required for a quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof.

h.    **Proxy.** Every Member entitled to vote at a meeting of the Members of the Company or to express consent or dissent without a meeting, or his or her duly authorized attorney-in-fact, may authorize another person or persons to act for him or her by proxy. The proxy must be signed by the Member or his or her attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof, unless otherwise provided in the proxy.

i.    **Voting.** Each Member shall be entitled to one (1) vote. The voting rights are determined solely upon membership and not based upon percentage interest in the Company. The affirmative vote of the majority of the Members represented at the meeting at which a quorum is present shall be the act of the Members of the Company, unless the vote of a greater number is required by the Articles of Organization, these Regulations, the Company's Organization and Operating Agreement, or the laws of the State of Florida.

j.    **Order of Business.** The order of business at the annual meeting of the Members of the Company and, insofar as possible, at all other meetings of the Members of the Company shall be as follows:

   i.      Call to order;
   ii.     Proof of notice of meeting;
   iii.    Reading and disposing of any unapproved minutes;
   iv.    Reports of Managers;
   v.     Reports of committees;
   vi.    Election of Managers;
   vii.   Disposition of unfinished business;
   viii.  Disposition of new business;
   ix.    Adjournment.

3.   Managers.

   a.    **Number of Managers.** The business of the Company shall be managed and its Company powers exercised by Managers. The number of Managers may be increased by amendment of these Regulations, by the affirmative vote of a majority of the Members (not the Interests) of the Company, at the annual meeting or at a special meeting called for that purpose, and by like vote the additional Managers may be chosen at such meeting to hold office until the next annual election and until their successors are elected and qualify. If at any time more than one Manager is elected, then the business of the Company shall be managed by such Managers. It shall not be necessary for Managers to be Members of the Company.

   b.    **Election and Term of Managers.** Managers shall be elected at the annual meeting of the Members of the Company, and each Manager elected shall hold office until his successor has been elected and qualified, or until his prior resignation or removal.

2

c.  **Duties of Managers.**  The Managers of this Company shall have the following duties:

i.  General and active management of the business and affairs of the Company, subject to the directions of the Managers, and shall preside at all meetings of the Members and the Managers.

ii.  Responsibility for the day-to-day supervision of the Company in conformity with the policies and directions decided by the Managers, if applicable, from time to time.  If a Manager is a corporation, the signature of a duly authorized officer of the Manager corporation shall be sufficient to bind the Company and every document executed by such officer shall be conclusive evidence in favor of every person relying in good faith thereon or claiming thereunder that at the time of the delivery thereof (a) this Company was in existence, (b) this Agreement had not been amended in any manner so as to restrict such authority, and ( c) the execution and delivery of such documents were duly authorized under this Article.  Such duly authorized officer shall have the authority to sign and execute any and all documents required to admit a new or substituted Member in accordance with the terms of this Agreement and shall file all documents necessary to give effect to the foregoing.  In addition, a Manager shall be the "tax matters partner" of the Company, within the meaning of §6231(a)(7) of the U.S. Code and any regulations issued thereunder, unless the Code or the regulations issued thereunder require another person to be the tax matters partner.  The expenses, if any, which the Manager incurs in fulfilling his or her covenants pursuant to this section shall be expenses of the Company.  Richard Shan is hereby named the "tax partner" of the Company.

iii.  The Secretary shall have custody of and maintain all of the Company records, except the financial records, shall record the minutes of all meetings of the Members and the Managers, shall send all notices of all meetings, and shall perform such other duties as may be prescribed by the Managers.  The Managers shall keep a written record of all proceedings and shall submit such record to the Managers at each regular meeting thereof and at such other times as may be requested by the Managers.  The failure to submit such record, or the failure of the Managers to approve any action indicated therein, shall not invalidate such action to the extent it has been carried out by the Company prior to the time the record thereof was or should have been submitted to the Managers as provided herein.  Richard Shan is hereby named as the Secretary.

iv.  The Treasurer is to have custody of all funds and financial records; shall keep full and accurate accounts of receipts and disbursements, and render accounts thereof at the annual meetings of the Members and whenever else required by the Managers; and shall perform such other duties as may be prescribed by the Managers.  Richard Shan is hereby named as the Treasurer; however, two signatures are necessary for the issuance of any checks.  For purposes hereof, a minimum of two Managers must sign all checks for the Company.

d.  **Vacancies.**  A vacancy in the office of Manager shall exist upon the happening of any of the following:

i.  A Manager dies, resigns or is removed from office;

ii.  The authorized number of Managers is increased without the simultaneous election of a Manager or Managers to fill the newly-authorized position(s);

iii.  Members at any annual, regular or special meeting at which Managers are to be elected, elect less than the number of Managers authorized to be elected at that meeting.

If the office of any Manager, member of a committee, or other officer becomes vacant, the remaining Managers in office, by a majority vote, may appoint any qualified person to fill such vacancy, who shall hold office for the unexpired term or until his or her successor shall be duly chosen.

3

e.    **Removal of Managers.** Any Manager may be removed with or without cause by vote of one hundred percent (100%) of all of the Members (not Interests) outstanding and entitled to vote at a special meeting of the Members called for that purpose. A reduction in the authorized number of Managers does not remove any manager from office prior to the expiration of its term of office.

f.    **Resignation.** A Manager may resign at any time by giving written notice to the Members. Unless otherwise specified in the notice, the resignation shall take effect upon receipt thereof by the Members. Acceptance of the resignation shall not be necessary to make it effective.

g.    **Quorum of Managers.** If there are two (2) Managers, both Managers constitute a quorum for the transaction of business. If there are more than two (2) Managers, a majority of the Managers shall constitute a quorum for the transaction of business. If at any meeting of the Managers, there shall be less than a quorum of Managers present, a majority of those present may adjourn the meeting from time to time until a quorum is obtained, and no further notice thereof need be given, other than by announcement at the meeting which shall be so adjourned. Notwithstanding anything to the contrary contained herein, if any Manager fails to attend a Managers' meeting after having received adequate written advance notice thereof, the remaining Manager(s) is/are authorized to act in the absence of such absent Manager, despite the lack of a quorum, as to all matters properly before the meeting. In the event vacancies exist on the Manager(s), other than vacancies created by the removal of a Manager or Managers by the Members or by an increase in the number of Managers, the remaining Managers, although less than a quorum, may elect a successor or successors for the unexpired term or terms by a majority vote of Managers.

h.    **Place and Time of Board Meetings.** The Managers may hold a Managers' meeting at the office of the Company or at such other place, either within or without the State of Florida, as it may from time to time determine.

i.    **Notice of Meetings of the Board.** A regular annual meeting of the Managers may be held without notice at such time and place as the Managers shall from time to time determine. Special meetings of the Managers shall be held upon notice to all Managers and may be called by any Manager upon three (3) days' notice to each other Manager, either personally, by mail or by wire, except in the case of an emergency. Notice of a meeting need not be given to any Manager who submits a waiver of notice, whether before or after the meeting, or who attends the meeting without protesting the lack of notice to it, whether prior thereto or at its commencement.

j.    **Regular Annual Meeting.** A regular annual meeting of the Managers shall be held immediately following the annual meeting of the Members of the Company at the place of such annual meeting of the Members. Managers may participate in a meeting of the Board by means of a conference telephone or similar communications equipment by which all persons participating can hear each other at the same time, and participation by such means shall constitute presence, in person, at a meeting.

k.    **Compensation.** No compensation shall be paid to the Managers, as such, for their services; but by resolution of the Managers, a fixed sum and expenses for actual attendance at each regular or special meeting of the Managers may be authorized. Nothing herein contained shall be construed to preclude any Manager from serving the Company in any other capacity and receiving compensation therefor.

l.    **Indemnification.** The Company shall indemnify any person who was or is a party, or is threatened to be a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that it, he or she is or was a Manager of the Company, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlements, actually and reasonably incurred by said Manager in connection with such action, suit, or proceeding. Said indemnification shall apply only if said Manager acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, said Manager had no reasonable cause to believe such conduct was unlawful.

4

Indemnification hereunder shall be made by the Company, only as authorized in the specific case, on a determination by a majority of the disinterested Managers that such individual met the applicable standard of conduct as set forth herein. Indemnification hereunder shall continue as to a person who has ceased to be a Manager and shall inure to the benefit of the heirs, executors and administrators of such a person.

4.    Membership Certificates.

a.    **Issuance.** Every holder of an Interest in this Company shall be entitled to have a certificate representing such Interest. No certificate shall be issued for any Interest until such Interest has been fully paid. Payments may be made by cash or its equivalent or by way of other property, but not by way of services.

b.    **Form.** Certificates representing Interests in this Company shall be signed by the President and Secretary of the corporate Manager. Each membership certificate shall state:

i.      The name of the Company;
ii.     That the Company is organized under the laws of the State of Florida;
iii.    The name of the person(s) to whom issued;
iv.     The percentage of the Interest represented by such certificate.

c.    **Transfer of Interests.** The Company shall register a membership certificate presented to it for transfer if the certificate is properly endorsed by the holder of record or by his, her or its duly authorized attorney. Transfers of membership certificates of the Company shall be made in the manner specified in the Company's Organization and Operating Agreement and/or the laws of the State of Florida, as applicable. The Company shall have the absolute right to recognize as the owner of any membership certificate issued by it, for all proper Company purposes, including voting and the issuance and payment of distribution on such membership certificate, the person or persons in whose name the certificate representing such Interest stands on its books. If a transfer of an Interest is made solely for the purpose of furnishing collateral security, and if such fact is made known to the Managers of the Company or to the Company's transfer agent or transfer clerk, the record entry of such transfer shall state the limited nature thereof.

d.    **Lost, Stolen or Destroyed Certificates.** If a Member shall claim to have lost or had stolen or destroyed a certificate issued by the Company, a new certificate shall be issued upon the making of an affidavit of that fact by the person claiming the membership certificate to be lost, stolen or destroyed and, at the discretion of the Managers, upon the deposit of a bond or other indemnity in such amount and with such sureties, if any, as the Managers may reasonably require.

5.    Books and Records.

a.    **Form and Location.** The Company shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its Members, Managers and committees of Managers, if any. The Company shall keep at its registered office or principal place of business a record of its Members, giving the names and addresses of all Members and the percentage of the membership certificates held by each. Any books, records and minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

b.    **Members' Inspection Rights.** Any person who shall have been a holder of record of a membership certificate of the Company for at least six (6) months immediately preceding his, her or its demand, upon written demand stating the purpose thereof, shall have the right to examine, in person or by agent or attorney, at any reasonable time, for any proper purpose, the relevant books and records of accounts, minutes and records of Members of the Company, and to make extracts therefrom.

5

c. **Financial Information.** Not later than one hundred twenty (120) days after the close of each fiscal year, the Company shall prepare a balance sheet showing in reasonable detail the financial condition of the Company as of the close of its fiscal year, and a profit and loss statement showing the results of the operations of the Company during its fiscal year. Upon the written request of any Member of the company, the Company shall mail to each Member a copy of the most recent balance sheet and profit and loss statement. The balance sheets and profit and loss statements shall be maintained at the registered office of the Company of this state; shall be kept for at least five (5) years; and shall be subject to inspection, in person or by agent during regular business hours, by any Member.

6. <u>Distributions.</u> The Managers may, out of funds legally available therefor, at any regular or special meeting, declare distributions upon the Interests of the Company as and when it deems expedient. Before declaring any distributions, there may be set apart, out of any funds of the Company available for distributions, such sum or sums as the Managers may, from time to time in its sole discretion, deem proper for working capital, or as a reserve fund to meet contingencies, or for equalizing distribution, or for such other purposes as the Managers shall deem conducive to the best interests of the Company. Initially, the Members agree to the following order of Distributions, in and when prudent and available: (a) payment of all invoices, mortgages and expenses as the same becomes due in the ordinary course of business (b) payment of interest on each Capital Account in the amount of twelve percent (12%) per annum, (c) return of each Member's Capital Account; and then finally, (d) to distribute any remaining monies as follows: (i) forty percent (40%) to the Members based upon their percentage ownership in the Company (e.g., BRSM Investments, Inc. 30% of the 40%: SG-JT Properties, L.L.C. 70% of the 40% and (ii) sixty (60%) to Richard Shan and Jodi Tartell on a 60/40 split basis. Richard Shan and Jodi Tartell may elect to have their income  directed to a corporation or an LLC  if they choose.

7. <u>Company Actions.</u> The Managers may authorize such Company actions, and the Company has the power and ability to enact, pursue or execute any and all of the acts and powers set forth within §608.404, Florida Statutes, Subsections 1-16, as may be in effect as of the date of adoption of these Regulations.

8. <u>Execution.</u> All Company instruments and documents shall be signed or countersigned, executed, verified or acknowledged by such officer or officers or other person or persons as the Managers may from time to time designate.

9. <u>Fiscal Year.</u> The fiscal year shall begin on the 1st day of January of each year.

10. <u>Notice and Waiver of Notice.</u> Whenever any notice is required by these Regulations to be given, personal notice is not meant, unless expressly so stated, and any notice so required shall be deemed to be sufficient if given by depositing same in a United States Post Office box in a sealed, post-paid wrapper, addressed to the person entitled thereto at his, her or its last known post office address, and such notice shall be deemed to have been given on the day of such mailing. Members not entitled to vote shall not be entitled to receive notice of any meetings, except as otherwise provided by statute. Whenever any notice is required to be given under the provisions of any law, or under the provisions of the Operating Agreement of the Company or these Regulations, a waiver thereof, in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

11. <u>Construction.</u> Whenever a conflict arises between the language of these Regulations and the Operating Agreement, the Articles of Organization shall govern. Whenever a conflict arises between the language of these Regulations and the Operating Agreement entered into by and between the Members of the Company, the terms of the Operating Agreement shall govern, control and/or supersede these Regulations.

6

12.     Business.

a.      **Conduct of Business Without Meetings.** Any action of the Members, Managers and any duly organized committee may be taken without a meeting if consent, in writing, setting forth the action so taken, shall be signed by all persons who would be entitled to vote on such action at a meeting, and filed with the Managers of the Company as part of the proceedings of the Members, Managers or committees, as the case may be.

b.      **Management By Members.** In the event the Members are named in the Articles of Organization and are empowered therein to manage the affairs of the Company in lieu of Managers, the Members of the Company shall be deemed Managers for the purposes of these Regulations, and wherever the words "Managers" or "Board" appear in these Regulations, those words shall be taken to mean "Members."

c.      **Officers.** The Managers may, by a majority vote, elect officers, including but not limited to a president, vice president, secretary and treasurer, to manage the business of the Company and exercise its Company powers.

13.     Amendments. These Regulations may be altered, modified or repealed at any annual meeting of the Members, or at any special meeting thereof, if notice of the proposed alteration, modification or repeal to be made is contained in the notice of such special meeting, by the affirmative vote of one hundred percent (100%) of the Members entitled to vote thereat, or by the affirmative vote of a majority of the Managers at any regular meeting of the Managers or at any special meeting of the Managers, if notice of the proposed alteration, modification, or repeal to be made be contained in the notice of such special meeting, unless the power to amend, adopt, alter or repeal these Regulations becomes vested in the Managers of the Company by the Articles or Organization.


IN WITNESS WHEREOF, the parties hereto have executed this agreement as of this 20th day of November, 2006.


WITNESSES:                                      Members:


                                                BRSM Investments, Inc.,
                                                a Florida corporation

_____                        By: _____
Signature of First Witness                           Richard Shan, its President
                                                     20141 Northeast 21st Avenue
_Joel B Davis_                                       Miami, Florida 33179
Printed Name of Witness


_____
Signature of Second Witness                     SG-JT Properties, L.L.C.,
                                                a Florida limited liability company
_Erica Smolyansky_
Printed Name of Witness                         By: _____
                                                     Jodi Tartell, its Manager
                                                     655 Hibiscus Drive
                                                     Hallandale Beach, Florida 33009


7

# Exhibit "B"

# PROMISSORY NOTE

$3,400,000.00

November 20, 2006
Aventura, Florida

**FOR VALUE RECEIVED,** the undersigned (hereinafter referred to as the "Maker") promises to pay to **IG FAMILY LIMITED LIABILITY LIMITED PARTNERSHIP, LLLP,** a Florida limited liability limited partnership (hereinafter referred to as the "Payee"), or order, at its principal place of business at 4040 Island Estates, Aventura, FL 33160, or at such other place as may be designated in writing by the holder of this Note, the principal sum of **THREE MILLION FOUR HUNDRED THOUSAND AND NO DOLLARS ($3,400,000.00),** with interest thereon from date at the rate described below. The undersigned hereby promises to pay principal and interest as follows:

Commencing on the first day of the month following the execution of this Note monthly payments of interest only shall be payable on the principal balance from time to time outstanding. Interest shall accrue at the One (1) month Libor Rate plus one (3%) percent per annum, computed on a daily basis and based on a 360 day year and number of days elapsed. The calculation date shall be the first date of each month and payments shall be made within ten (10) days thereafter. The total annual percentage rate of interest herein charged shall not exceed the maximum rate of interest permitted by the usury laws of the State of Florida or the United States, from time to time during the term of this Note, whichever is greater. All monthly payments shall be first applied to interest at the rate set forth above and the balance of the monthly payments shall be applied in reduction of principal. In no event shall the interest here charged be less than five percent (5.00%) per annum.

The principal balance of this note shall be payable in full on November 20, 2008, together with any accrued and unpaid interest.

Should the Maker hereof (or the Endorsers or any Guarantor hereof) fail to pay the installment of interest or principal due on this Note by the tenth (10th) day from the due date, then the Maker agrees to pay a late charge of five (5%) per cent of the sum overdue, as a handling charge for the Maker's failure to make prompt payment.

If any installment of principal or interest or any part thereof is not paid within ten (10) days from the date due or upon occurrence of any one or more events of default specified in any agreement, mortgage or security agreement referred to in this Note which has not been remedied within the time specified therein, if any, or in the event of any default under any guaranty, all amounts then remaining unpaid on this Note may be declared to be immediately due and payable.

The Maker, Endorsers, guarantors, sureties and all other parties liable for the payment of any sum or sums due or to become due under the terms of this Note waive presentment, protest and demand, and notice of protest, demand and dishonor, and non-payment of this Note, and consent that the holder hereof shall have the right, without notice, to deal in anyway at any time with any party hereto, or to grant any extension or extensions of time for payment of any of the indebtedness or any other indulgences or forbearances whatsoever, or may release any of the security for this note or guarantors of this Note without in anyway affecting the liability of any other party for the payment of the Note.

This Note shall be deemed to reflect the principal amount actually outstanding, even though the face amount may be in excess of the principal amount outstanding from time to time.

PLF/DEF R Shan
EXHIBIT 2
DATE 1/24/15 RPTR LE
Orange Legal

Interest hereunder shall be charged only on the sums advanced from the date of advance to the date of repayment, and interest from the date of this Note to the date of advance is waived. The Maker hereof does not intend or expect to pay, nor does the Payee intend or expect to charge, accept or collect any interest which, when added to any commitment fee or any other charge upon the principal, shall be in excess of the highest lawful rate allowable under the laws of the State of Florida or the United States of America, whichever is higher or unlimited. Should acceleration, prepayment or any other charges upon the principal or any portion thereof result in the computation or earning of interest in excess of the highest lawful rate allowable under the laws of the State of Florida or the United States of America, whichever is higher or unlimited, any and all such excess is hereby waived and shall be credited to the outstanding principal balance or returned to the Maker.

While in default and after maturity of this Note, either by its terms or acceleration, interest shall accrue and be payable at the highest rate of interest permitted by the usury laws of the State of Florida and of the United States, whichever is higher or unlimited, from the due date until paid. The post judgment rate of interest for any judgment entered pursuant to this Note or any other loan document executed in connection herewith shall be the greater of: (i) the default rate set forth in this Note; or (ii) the rate established by the Comptroller of the State of Florida pursuant to Section 55.03 (1), Florida Statutes.

No delay on the part of the Payee in exercising any power or right hereunder shall operate as a waiver thereof; nor shall any single exercise or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right; nor shall the Payee be liable for exercising or failure to exercise any such power or right hereunder. The rights or remedies herein expressly specified are cumulative and not exclusive remedies which the Payee may have.

This Note is secured by a mortgage and security agreement executed by the Maker hereof constituting a lien on real estate and personal property. It is expressly agreed that all of the covenants, conditions and agreements contained in the mortgage and security agreement executed in connection herewith are hereby made part of this Note.

This Note will be considered in default upon any default under the terms of the mortgage or security agreement securing this Note or any other agreement executed by Maker in conjunction with this Note. In such event, the Payee may at its election declare the Note due and payable. Failure at any time to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.

In addition to any other Event provided in this Note, the Maker will be in default upon occurrence of any of the following: (a) any creditor tries to take any of Maker's property on or in which Payee has a lien or security interest (this includes a garnishment of any of Maker's accounts with Payee) and (b) the issuance of any tax levy or lien against Maker or Maker's failure to pay, withhold, collect or remit any tax when assessed or due.

This Note shall be governed, construed and interpreted in accordance with the internal laws of the State of Florida without giving effect to principles of conflict laws.

Should it become necessary to collect this Note through an attorney, all parties hereto, whether Maker, Endorser or Guarantors, each severally agrees to pay all costs of collecting this Note, including reasonable attorneys' fees, plus costs incurred in enforcing this Note and recovery of all amounts owing by Payee whether collected by suit including in trial, on appeal, in Bankruptcy proceedings or otherwise.

Maker agrees upon the request of Payee to pay all such taxes, duties and other charges in addition to principal and interest on this Note including all documentary stamp taxes and intangible taxes as are from time to time payable or assessed on this Note, but exclusive of United States income taxes and Florida

income taxes.

This Note may not be terminated orally, but only by discharge in writing and signed by the party who is the owner and holder of this Note at the time enforcement of any discharge is sought.

The Payee may so transfer this Note and/or any of its rights and power hereunder, and in the event of such transfer, the transferee hereof or of such rights and powers shall have the same rights and remedies hereunder as if originally named herein in place of the Payee.

This Note and the provisions hereof are to be binding upon the heirs, executors, administrators, assigns or successors of Maker and Payee.

PAYEE AND MAKER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE NOTE, THE MORTGAGE OR ANY OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON. THIS SECTION IS A MATERIAL INDUCEMENT FOR THE PAYEE TO EXTEND THE LOAN EVIDENCED BY THIS NOTE.

HALLANDALE    BEACH    BUSINESS CENTER, L.L.C.,
a Florida limited liability company

By:
Name: Richard Shan
Title:  Co-Manager

By:
Name: Jodi Tardell
Title:  Co-Manager

Exhibit "C"



RECORD & RETURN TO:

**This instrument prepared by
and return to:**
Joel A. Savitt, Attorney at Law
20801 Biscayne Blvd, Suite 506
Aventura, FL 33180

**FLORIDA MORTGAGE
AND SECURITY AGREEMENT**

THIS **MORTGAGE** is executed this ·3 ʰday of _December_ 2006, by and between **HALLANDALE
BEACH BUSINESS CENTER, L.L.C.,** a Florida limited liability company, whose address is  20141 N.E. 21ˢᵗ Avenue,
Miami, FL 33179 (hereinafter referred to as the **"Mortgagor"**) and **IG FAMILY LIMITED LIABILITY LIMITED
PARTNERSHIP, LLLP,** a Florida limited liability limited partnership, whose address is 4040 Island Estates, Aventura,
FL 33160, (hereinafter referred to as the **"Mortgagee"**).

**W I T N E S S E T H :**

For good and valuable consideration and to secure the payment of an indebtedness in the aggregate sum of
**THREE MILLION FOUR HUNDRED THOUSAND AND 00/100 DOLLARS (U.S.$ 3,400,000.00)** or so much thereof
as may be advanced, to be paid in accordance with a promissory note of **even date herewith** made by Mortgagor and
payable to Mortgagee (hereinafter referred to as the "Note") together with interest thereon and any and all other notes
secured by this Mortgage and all sums due or which may become due from Mortgagor to Mortgagee and any renewals,
extensions, consolidations or modifications of all of the foregoing, Mortgagor does grant, mortgage and convey unto
Mortgagee, its successors and assigns, in fee simple, all of the following described tract of land of which Mortgagor
is now seized and possessed and in actual possession, situate in the **County of Broward, State of Florida,** together
with the buildings and improvements thereon erected or to be erected (all hereinafter referred to as the "Premises"):

LOTS 1 THROUGH 6, AND LOT 19, LESS THE NORTH 10 FEET, & LOT 20, BLOCK 30, OF THE
PLAT OF THE TOWN OF HALLANDALE, AS RECORDED IN PLAT BOOK "B", PAGE 13 OF THE
PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, SAID LAND SITUATE, LYING AND
BEING IN BROWARD COUNTY, FLORIDA.

TOGETHER with the following property and rights:

(a) All right, title and interest of Mortgagor in and to all leases or subleases covering the Premises or any
portion thereof now or hereafter existing or entered into, and all right, title and interest of Mortgagor thereunder,
including, without limitation, all cash or security deposits, advance rentals, and deposits or payments of similar nature;

(b) All right, title and interest of Mortgagor in and to all options to purchase or lease the Premises or any
portion thereof or interest therein, and any greater estate in the Premises owned or hereafter acquired;

(c) All interests, estate or other claims, both in law and in equity, which Mortgagor now has or may hereafter
acquire in the Premises;

(d) All easements, rights-of-way and rights used in connection therewith or as a means of access thereto and
all tenements, hereditaments and appurtenances thereof and thereto, all right, title and interest of Mortgagor in and
to any streets and roads abutting said Premises to the center lines thereof and in and to any strips or gores of land
therein, all water, sanitary and storm systems that are now or hereafter located on or adjacent to the Premises and
all gas and oil rights, mineral rights, timber rights and riparian and littoral rights pertaining to the Premises;

(e) All machinery, apparatus, equipment, fittings, fixtures and articles of personal property of every kind and
nature whatsoever, now owned or hereafter owned by Mortgagor and which is now or will hereafter be located in or
upon the Premises, or any part thereof, and used or usable in connection with the use and operation of buildings or
for use in any construction being conducted on the Premises, (hereinafter called the "Building Equipment"), it being
understood and agreed that all Building Equipment is part and parcel of the Premises and appropriated to the use
thereof and, whether affixed or annexed to the Premises or not, shall for the purpose of this Mortgage be deemed
conclusively to be real estate and mortgaged hereby; and Mortgagor agrees to execute and deliver, from time to time,
such further instruments as may be requested by Mortgagee to confirm the lien of this Mortgage on any Building
Equipment;

(f)  All awards and proceeds to which Mortgagor is entitled by virtue of any taking of all or any part of the Premises by condemnation or exercise of the right of eminent domain or other taking, as hereinafter more particularly set forth; and

(g)  All rents, issues and profits of the Premises and all estate, right, title and interest of every nature whatsoever of Mortgagor in and to the same, as hereinafter more particularly set forth;

The Premises and all of the property, rights, privileges and franchises granted herein by Mortgagor to Mortgagee are collectively referred to as the "Mortgaged Property."

TO HAVE AND TO HOLD all and singular the Mortgaged Property hereby conveyed, the tenements, hereditaments and appurtenances thereunto belonging or in anyway appertaining and the reversion and reversions, remainder and remainders, rents, issues and profits thereof and all estate, right, title, interest, property, possession, claim and demand whatsoever as well in law, as in equity of the Mortgagor in and to the same and every part and parcel thereof unto the said Mortgagee in fee simple.

PROVIDED, HOWEVER, that these presents are upon the condition that if Mortgagor shall pay or cause to be paid to Mortgagee the principal and interest payable in respect to the Note and all amounts and any other promissory note secured by this Mortgage, at the times and in the manner stipulated therein and herein, all without any deduction or credit for taxes or other similar charges paid by Mortgagor, and shall keep, perform and observe all and singular the covenants and promises in the Note, and any renewal, extension, consolidation or modification thereof, and in this Mortgage expressed to be kept, performed and observed by and on the part of Mortgagor, all without fraud or delay, then this Mortgage and all properties, interest and rights granted, mortgaged and conveyed shall cease, terminate and be void but until same shall occur, this Mortgage shall otherwise remain in full force and effect.

## ARTICLE 1
## COVENANTS AND AGREEMENTS OF MORTGAGOR

To protect the security of this Mortgage, Mortgagor further covenants, warrants and agrees with Mortgagee as follows:

1.01  Payment of Secured Obligations.  Mortgagor shall pay within ten (10) days of when due the principal and interest on the indebtedness evidenced by the Note, charges, fees and principal of, and interest on, any future advances secured by this Mortgage and shall otherwise comply with all the terms of the Note and this Mortgage.

1.02  Title Warranties and Representations.  Mortgagor hereby covenants with Mortgagee that Mortgagor is (a) indefeasibly seized of the Premises in fee simple; (b) Mortgagor has full power and lawful right to convey the same in fee simple as aforesaid; (c) that it shall be lawful for Mortgagee at all times to peaceably and quietly enter upon, hold, occupy and enjoy said Premises and every part thereof; (d) that Mortgagor will make such further assurances to perfect the fee simple title to said Premises in Mortgagee, as may reasonably be required; (e) that the Mortgaged Property is free of all liens and encumbrances and taxes for the current year; and (f) Mortgagor does hereby fully warrant title to the Mortgaged Property and every part thereof and will defend same against the lawful claims of all persons whomsoever.

1.03  Required Insurance.  Mortgagor will, at Mortgagor's sole cost and expense, maintain or cause to be maintained with respect to the Mortgaged Property, and each part thereof, the following insurance.

(a)  At all times:

(i)  Insurance against loss or damage to the building improvements on the land and the Building Equipment (hereinafter referred to as the "Improvements") by fire and any of the risks covered by insurance of the type known as "all-risk" including, without limitation, coverage for plate glass damage, sprinkler leakage and sink hole collapse. Coverage shall be in an amount not less than the full replacement cost of the Improvements but not less than an amount equal to the amount of the loans secured hereby, including heating and air conditioning coverage at 100% of replacement cost. (Co-insurance is to be waived by the insurer.)

(ii)  Income insurance is required if the Mortgaged Property is rental property.  Such amount to be equal to the projected rents as reasonably determined by the Mortgagee.

(iii)  General public liability insurance in which both the Mortgagor and Mortgagee are named as insured in an amount not less than ONE MILLION DOLLARS ($1,000,000.00) as to personal injury or death, and ONE HUNDRED THOUSAND DOLLARS ($100,000.00) with respect to property damage, or such greater limits as may reasonably be required by Mortgagee, with such companies, on such terms, in such form and for such periods as Mortgagee shall from time to time approve.  Such policy shall also be endorsed to cover the liability of the Mortgagor with respect to damages arising from any loss or damage sustained by any person while on the Property.

(b)  Flood insurance is required if at any time the encumbered land is designated a flood prone or flood risk area, pursuant to the Flood Disaster Protection Act of 1973, as amended or supplemented.

(c)     Such other insurance and in such amounts as Mortgagee may reasonably require from time to time including but not limited to builder's risk, if applicable, and in accordance with local insurance practice.

Mortgagor may obtain any other insurance not required under this Section 1.03, but any such insurance affecting the Premises shall be for the mutual benefit of Mortgagor and Mortgagee and shall be subject to the other provisions of this Mortgage.

1.04   <u>Delivery of Policies, Payment of Premiums.</u>  All policies of insurance shall be issued by companies and in amounts  satisfactory to Mortgagee. All policies of insurance shall have attached thereto a lender's loss payment endorsement for the benefit of Mortgagee in form satisfactory to Mortgagee.  The original policies and renewals shall be held by Mortgagee or if acceptable to Mortgagee, a certificate of insurance for each such policy setting forth coverage, limits of liability, name of carrier, policy number, and expiration date.   At least fifteen (15) days prior to expiration of each such policy, Mortgagor shall furnish Mortgagee with evidence satisfactory to Mortgagee, of payment of premium and reissuance of a policy continuing insurance in force as required by this Mortgage.  All such policies shall contain a provision that such policies will not be cancelled or materially amended, which term shall include any reduction in the scope or limits of coverage, without at least thirty (30) days prior written notice to Mortgagee.  In the event Mortgagor fails to provide, maintain, keep in force or deliver and furnish to Mortgagee the policies of insurance or certificates thereof, as required by this Section, Mortgagee may procure such insurance or single interest insurance for such risks covering Mortgagee's interest.  Repayment shall be governed by the provisions of Section 4.03 of this Mortgage.

1.05     <u>Insurance Proceeds.</u>  After the happening of any casualty to the Mortgaged Property or any part thereof, Mortgagor shall give prompt written notice thereof to Mortgagee; and

(a) in the event of damage to or destruction of the Improvements, Mortgagee shall have the option, in its sole discretion subject further to subparagraph (b) below, of applying or paying all or part of the insurance proceeds (i) to any indebtedness secured hereby and in such order as Mortgagee may determine, or (ii) to the restoration of the Improvements, or (iii) to Mortgagor;

(b) Mortgagee agrees not to unreasonably withhold consent to the use of insurance proceeds for restoration of the Improvements following a partial casualty loss, subject to (i) Mortgagor maintaining the Mortgage free from default at all times; (ii) Mortgagor providing evidence that adequate funds are available to restore the Improvements and advancing any additional funds required prior to the disbursement of insurance proceeds; (iii) all tenants at the Premises acknowledging their leases remain valid and in full force; and (iv) Mortgagee retaining control of insurance proceeds prior to use for restoration;

(c) in the event of such loss or damage, all proceeds of insurance subject to the rights of any superior lien holders, shall be payable to Mortgagee and Mortgagor.  Mortgagor hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to Mortgagee.  Mortgagee is hereby authorized and empowered by Mortgagor to settle, adjust or compromise any claims for loss, damage or destruction under any policy or policies of insurance. Mortgagor hereby irrevocably appoints Mortgagee its attorney-in-fact coupled with an interest with the power and authority to endorse any checks, drafts or other instruments representing any proceeds of such insurance, whether payable by reason of loss thereunder or otherwise;

(d) except to the extent that insurance proceeds are received by Mortgagee and applied to the indebtedness secured hereby, nothing herein contained shall be deemed to excuse Mortgagor from repairing or maintaining the Mortgaged Property as provided in this Mortgage or restoring all damage or destruction to the Mortgaged Property, regardless of whether or not there are insurance proceeds available or whether any such proceeds are sufficient in amount, and the application or release by Mortgagee of any insurance proceeds shall not cure or waive any default or notice of default under this Mortgage or invalidate any act done pursuant to such notice; and,

(e)  nothing herein shall relieve Mortgagor from making the payments required by the Note and any other obligation of Mortgagor secured hereby.

1.06   <u>Assignment of Policies Upon Foreclosure.</u>  In the event of foreclosure of this Mortgage or other transfer of title or assignment of the Mortgaged Property in extinguishment, in whole  or in part of the debt secured hereby, all right, title and interest of Mortgagor in and to all policies of insurance required by this Section shall inure to the benefit of and pass to the successor in interest to Mortgagor or the purchaser or grantee of the Mortgaged Property.

1.07   <u>Indemnification; Waiver of Offset.</u>  a) If Mortgagee is made a party defendant to any litigation (including without limitation, any litigation brought by Mortgagor whether initially or by counterclaim) concerning this Mortgage or the Mortgaged Property or part thereof or interest therein, or occupancy thereof by Mortgagor, then Mortgagor shall indemnify, defend and hold Mortgagee harmless from all liability by reason of said litigation, including reasonable attorneys' fees and expenses incurred by Mortgagee in any such litigation, whether or not such litigation is prosecuted to judgment; (b) All sums payable by Mortgagor hereunder shall be paid absolutely, unconditionally, without notice, demand, counterclaim, setoff, deduction or defense and absolutely and unconditionally without abatement, suspension, deferment, diminution or reduction.  The obligations and liabilities of Mortgagor hereunder shall in no way be released or discharged (except as expressly provided herein) by reason of: (i) any damage to or destruction of or any condemnation or similar taking of the Mortgaged Property or any part thereof; (ii) any restriction, prevention of or interference with any use of the Mortgaged Property or any part thereof; (iii) any title defect, encumbrance or eviction from the Premises or the Improvements or any part thereof by title paramount or otherwise;  (iv)  any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to

Mortgagor, or any action taken with respect to this Mortgage by any trustee or receiver of Mortgagor, or by any court, in any such proceeding.

1.08  Taxes, Utilities and Impositions.  Mortgagor will pay, or cause to be paid and discharged, on or before the last day on which they may be paid without penalty or interest, all such duties, taxes, sewer rents, charges for water, or for setting or repairing meters, and all other utilities in the Improvements or on the Premises or any part thereof, and any assessments and payments which shall be imposed upon or become due and payable or become a lien upon the Premises or any part thereof and sidewalks or streets in front thereof by virtue of any present or future law of the United States or the State, County or City wherein the Premises are located (all of the foregoing being herein collectively called "Impositions.")  In default of any such payment of any Imposition, Mortgagee may pay the same. Repayment shall be governed by the provisions of Section 4.03 of this Mortgage.

Mortgagor will exhibit to Mortgagee the original receipts or other reasonably satisfactory proof of the payment of all Impositions which may affect the Mortgaged Property or any part thereof or the lien of the Mortgage promptly following the last date on which each such Imposition is payable hereunder.

1.09  Deposits of Taxes and Insurance Premiums.  In order to more fully protect the security of this Mortgage and the fulfillment by Mortgagor of the obligations and undertakings contained in Sections 1.03, 1.04 and 1.08 hereof and, solely as additional security to Mortgagee, Mortgagor shall, after occurrence of an Event of Default  pay monthly to Mortgagee or its designated representative, on the date set in this Mortgage for payment of principal and interest, an amount which shall be equal to one-twelfth (1/12th) of the annual Impositions that may become due during the year and an amount which shall be equal to one-twelfth (1/12th) of the annual insurance premiums with respect to insurance coverage Mortgagor is required to maintain pursuant to the provisions of this Mortgage (all as estimated by Mortgagee, or its representative).  If Mortgagee exercises its rights under this Section, Mortgagor shall cause all bills, statements or other documents relating to Impositions or payment of insurance premiums to be sent or mailed directly to Mortgagee or its designated representative.

It is the intention of this Section 1.09 that there shall be sufficient monies on deposit with Mortgagee so that when such payments are due to any taxing authority or insurance carrier, there will be sufficient money held by Mortgagee to make such payments on their due dates.  If said deposits are insufficient to pay the Impositions and insurance premiums in full as the same become payable, the Mortgagor will deposit with the Mortgagee such additional sum or sums as may be required in order for the Mortgagee to pay such Impositions and insurance premiums in full. Mortgagee or its designated representative may co-mingle such monies with its own funds and Mortgagor shall not be entitled to interest thereon.  Upon any default hereunder, or under the Note, the Mortgagee may, at its option, apply any money held by Mortgagee resulting from said deposits to the payment of the indebtedness secured hereby in such manner as it may elect.

1.10  Maintenance, Repairs, Alterations.  Mortgagor will keep the Mortgaged Property, or cause same to be kept in good condition, repair and fully protected from the elements to the satisfaction of Mortgagee and Mortgagor will not do or suffer to do anything which will increase the risk of fire or other hazard to the Premises or any part thereof.  Mortgagor will commit or permit no waste thereon and will do or permit no act by which the Mortgaged Property shall become less valuable. Mortgagor will not remove, demolish or structurally alter any of the Improvements (except such alterations as may be required by laws, ordinances or regulations) without prior written permission of Mortgagee; Mortgagor will complete promptly and in good and workmanlike manner any building or improvements which may be constructed on the Premises and promptly restore in like manner any Improvement which may be damaged or destroyed thereon and will pay when due all claims for labor performed and materials furnished therefor. Mortgagor will use and operate, and will require its lessees or licensees to use and operate the Mortgaged Property in compliance with all applicable laws, ordinances, regulations, covenants, conditions and restrictions, and with all applicable requirements of any lease or sublease now or hereafter affecting the Premises or any part thereof.

1.11  Eminent Domain.
(a)    Should the Mortgaged Property or any part thereof or interest therein, be taken or damaged by reason of any public use or improvement or condemnation proceeding, or in any other manner ("Condemnation") or should Mortgagor receive any notice or information regarding such Condemnation, Mortgagor shall give prompt written notice thereof to Mortgagee;

(b)    Mortgagee shall be entitled to all awards, compensation, and other payment or relief granted in connection with such Condemnation and shall be entitled, at its option, to appear in its own name or the Mortgagor's name, in any action or proceeding relating thereto. In the event of such an appearance, Mortgagor agrees to pay reasonable attorneys' fees incurred by Mortgagee. All compensation, awards, damages, rights of action and proceeds awarded to Mortgagor (the "Proceeds") are hereby assigned to Mortgagee and Mortgagor agrees to execute such further assignments of the Proceeds as Mortgagee may require;

(c)    In the event any portion of the Mortgaged Property is so taken or damaged, Mortgagee and Mortgagor shall have the option  to apply all such Proceeds, after deducting therefrom all costs and expenses (regardless of the particular nature thereof whether incurred with or without suit), including attorneys' fees incurred by it in connection with such Proceeds, upon any indebtedness secured hereby, or apply all such Proceeds after such deductions to the restoration of the Mortgaged Property upon such conditions as Mortgagee may determine. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice; and

(d)    Any amounts received by Mortgagee and Mortgagor hereunder (after payment of any costs in connection with obtaining same) shall, if retained by Mortgagee, be applied in payment of any accrued interest and

4

then in reduction of the then outstanding principal sum of the Note secured hereby, notwithstanding that same may not then be due and payable. Any amount so applied to principal shall be applied to the payment of installments of principal on the Note in inverse order of their respective due dates.

1.12 <u>Action of Mortgagee to Preserve Security of this Mortgage.</u> In the event Mortgagee is called upon to pay any sums of money to protect this Mortgage and the Note secured hereby as aforesaid, all monies advanced or due hereunder shall become immediately due and payable together with interest at the maximum rate permitted by Florida law computed from the date of such advance to the date of the actual receipt of payment thereof by Mortgagee.

1.13 <u>Inspections.</u> Mortgagee, its agents, representatives, or workmen are authorized to enter at any and all reasonable times upon or in any part of the Premises for the purpose of inspecting same and performing any of the acts it is authorized to perform under the terms of this Mortgage. Mortgagor agrees to reimburse Mortgagee for reasonable out-of-pocket expenses incurred by it in connection with such inspections.

1.14 <u>Liens.</u> Mortgagor will not permit any liens, encumbrances, mechanics', laborer's, statutory or other lien and charges upon the Mortgaged Property, and shall pay and promptly discharge, at Mortgagor's cost and expense, all such liens, encumbrances and charges upon the Mortgaged Property or any part thereof or interest therein. Mortgagor shall have the right to contest in good faith the validity of any such lien, encumbrance or charge, provided Mortgagor shall first deposit acceptable security with a court of competent jurisdiction sufficient to eliminate the lien as a lien upon the Premises. If Mortgagor shall fail to transfer the lien to a bond or otherwise discharge any such lien, encumbrance or charge, then in addition to any other right or remedy of Mortgagee, Mortgagee may but is not obligated to discharge same either by paying the amount claimed to be due or by procuring the discharge of such lien by depositing in court a bond for the amount claimed or otherwise giving security for such claim, or in such manner as is or may be prescribed by law. Repayment shall be governed by the provisions of Section 4.03 of this Mortgage.

1.15 <u>Hazardous Waste.</u>
(a)     Mortgagor expressly represents to Mortgagee that the Mortgaged Property or any part thereof has not in the past been used, is not now being used, nor will in the future be used for handling, storage, transportation, or disposal of hazardous or toxic materials. Mortgagor shall not use, generate, manufacture, store or dispose of, on, under or about the Mortgaged Property or transport to or from the Mortgaged Property any flammable explosives, radioactive materials, including any substances defined as or included in the definition of "hazardous substances, hazardous waste, hazardous materials, and toxic substances" under any applicable federal or state laws or regulations in effect during the term of this Mortgage (collectively, the "Hazardous Materials").

(b)     Mortgagor, after thorough investigation warrants and represents to Mortgagee that:

(i)      The Premises is now and at all times hereafter will continue to be in full compliance with all federal, state and local environmental laws and regulations, including but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), the Federal Water Pollution and Control Act, the Federal Clean Water Act, the National Environmental Policy Act, the Resource Conservation and Recovery Act of 1976 ("RCRA"), the Hazardous Material Transportation Act, the Federal Clean Air Act, Chapters 376 ("Pollutant Discharge Prevention and Removal"), 377 ("Energy Resources"), and 403 ("Environmental Control") of Florida Statutes, and rules related thereto including Chapters 17, 27, and 40 of the Florida Administrative Code, (hereinafter together with any amendments thereto "Environmental Laws");

(ii)     No part of the Premises or any building, structure or facility located thereon or improvement thereto contain or contained asbestos or have had asbestos-containing materials installed hereon or therein at any time during or prior to Mortgagor's ownership or operation thereof; No part of the Premises or any building, structure or facility located thereon or improvement thereto contain or contained PCB's or have or have had electrical transformers, fluorescent light fixtures, ballasts or other equipment containing PCB's installed thereon or therein at any time during or prior to Mortgagor's ownership or operation thereof; No part of the Premises or any building, structure or facility located thereon or improvement thereto is or has been used as a sanitary landfill, and no Hazardous Substances have been buried, spilled or disposed of on or within the boundaries of the Premises, at any time during or prior to Mortgagor's ownership or operation thereof;

(iii)    The Premises is not on any Hazardous Substance cleanup list of any governmental authority; Mortgagor has not received a summons, citation, directive, letter or other communication, written or oral, from any governmental authority including, but not limited to any agency, county, environmental department, State of Florida or the United States government nor has any action ever been commenced or threatened by any governmental authority concerning any intentional or unintentional action or omission on Mortgagor's part which resulted in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of Hazardous Substances into or onto the Premises:

(iv)     Except as specifically disclosed herein, the Premises has never been used by previous owners or operators, or by Mortgagor, to generate, manufacture, refine, transport, treat, store, handle or dispose of Hazardous Substances, and Mortgagor does not intend to use any part of the Premises, for such purposes;

(c)     Mortgagor hereby agrees to indemnify Mortgagee and hold Mortgagee harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and

orders, judgments, remedial action requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including but not limited to attorneys' fees, paralegal charges and expenses), arising directly or indirectly, whole or in part, out of (i) the presence on or under the Mortgaged Property of any Hazardous Materials or releases or discharges of Hazardous Materials on, under or from the Mortgaged Property, (ii) any activity carried on or undertaken on or off the Mortgaged Property, whether prior to or during the term of the Mortgage, and whether by Mortgagor or any predecessor in title or any employees, agents, contractors or subcontractors of Mortgagor or any predecessor in title, or third persons at any time occupying or present on the Mortgaged Property in connection with the treatment, decontamination, handling, removal, storage, clean-up, transport or disposal of any Hazardous Materials at any time located or present on or under the Mortgaged Property; and (iii) any breach of the covenants contained in this Section 1.15. The foregoing indemnity shall further apply to any residual contamination on or under the Mortgaged Property or affecting any natural resources, any contamination of any property or natural resources arising in connection with the generation, use, handling, storage, transport or disposal of any such Hazardous Materials, and irrespective of whether any such activities were or will be undertaken in accordance with applicable laws, regulations, codes and ordinances. The obligation of Mortgagor to indemnify and hold harmless under this Section 1.15 shall survive any foreclosure of this Mortgage or any transfer of the Mortgaged Property by deed in lieu of foreclosure.

1.16 <u>Transfer of Mortgaged Property.</u> It is understood and agreed by Mortgagor that as part of the inducement to Mortgagee to make the loan evidenced by the Note and secured by this Mortgage, Mortgagee has relied upon the creditworthiness and reliability of Mortgagor. Mortgagor shall not sell, convey, transfer, lease (other than a space lease) or further encumber any interest in or any part of the Mortgaged Property without the prior written consent of the Mortgagee having been obtained. Any such sale, conveyance, transfer, pledge, lease (other than a space lease) or encumbrance made without the Mortgagee's prior written consent shall constitute an Event of Default hereunder. Any sale, conveyance or transfer of any interest in the Mortgagor to any other entity, individual, firm, partnership or corporation without the Mortgagee's prior written consent shall constitute a transfer pursuant to the provisions of this section and an Event of Default under this Mortgage. A contract to deed or agreement for deed or assignment of beneficial interest in any trust shall constitute a transfer pursuant to the provisions of this Section and an Event of Default under this Mortgage. If any person or entity should obtain any interest in all or any part of the Mortgaged Property, pursuant to execution or enforcement of any lien, security interest or other right whether superior, equal or subordinate to this Mortgage or the lien hereof, such event shall be deemed to be a transfer by Mortgagor and an Event of Default under this Mortgage. Mortgagor shall be entitled to release portions of the Mortgaged Property as provided in the Construction Loan Agreement as described in Section 5.02 hereof.

1.17 <u>Other Mortgage Liens.</u> Mortgagor represents and warrants that it will perform and promptly fulfill all of the covenants contained in any superior or inferior mortgages on any and all of the Premises encumbered hereby. In the event Mortgagor shall fail to do so, Mortgagee may, in addition to the rights otherwise granted Mortgagee hereunder, at its election, perform or fulfill such covenants of any such superior or inferior mortgages without affecting its option to foreclose any of the rights hereunder, and the cost thereof, together with interest from the date of payment at the highest rate permitted by Florida law from the date incurred until paid by Mortgagor, shall be secured hereby. The failure of Mortgagor to pay any superior or inferior mortgages when due, and in accordance with their terms, or the failure by Mortgagor to abide by the terms and conditions of any superior or inferior mortgages shall be deemed a breach of this Mortgage, and the Mortgagee, at its option, may immediately, or thereafter, declare this Mortgage, and all indebtedness hereby secured, to be immediately due and payable. Mortgagor shall not apply for, accept, or cause to be made, future advances under any superior or inferior mortgages so long as this Mortgage to Mortgagee, encumbering the property described herein remains in force. Mortgagor acknowledges and agrees that, in the event it breaches this covenant, same shall be an event of default under this Mortgage, and in such event Mortgagee shall have the right to exercise any and all of its rights and remedies provided for herein. Nothing in this Section shall be construed to waive the prohibition of further encumbering the Mortgaged Property without Mortgagee's prior consent.

1.18 <u>Financial Statements.</u> As soon as practicable after the close of each calendar year of Mortgagor but no later than sixty (60) days after such close, Mortgagor will furnish to Mortgagee an annual operating statement showing all income and expenses with respect to the operation of the Mortgaged Property; such statement to be certified by Mortgagor as true and correct. Mortgagor further agrees to furnish such additional information, reports or statements relating to the operation and management of the property as Mortgagee may from time to time require.

ARTICLE 2
ASSIGNMENT OF LEASES, SUBLEASES,
FRANCHISES, RENTS, ISSUES AND PROFITS

2.01 <u>Assignment of Rents.</u> Mortgagor hereby assigns and transfers to Mortgagee all leases, subleases, franchises, rents, issues and profits of the Mortgaged Property as additional security for repayment of the Note and all other sums that may be due to Mortgagee under the terms of this Mortgage. Mortgagor irrevocably appoints Mortgagee its true and lawful attorney-in-fact, at the option of Mortgagee at any time and from time to time to demand, receive and enforce payment, give receipts, releases and satisfactions, and to sue, in the name of Mortgagor or Mortgagee, for all such rents, issues and profits. Mortgagor, however, shall have the right to collect such rents, issues and profits (but not more than two [2] months in advance) prior to or at any time there is not an Event of Default under this Mortgage. If required by Mortgagee, Mortgagor will specifically assign to Mortgagee all such leases whether now existing or hereafter created. Mortgagor does hereby assign and transfer to Mortgagee, as additional security for the Note and all other sums that may be due to Mortgagee under the terms of the Mortgage, all undisbursed rents that may be in the possession of the Mortgagor, or in the registry of a Court, or in such other depository as ordered by a Court.

2.02 <u>Collection Upon Default.</u> Upon any Event of Default under this Mortgage, Mortgagee may at any time without notice either in person, by agent or by a receiver appointed by court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of the Mortgaged Property or any

part thereof. Mortgagee may in its own name, sue for or otherwise collect such rents, issues, and profits, including past due and unpaid, and apply same less costs and expenses of operation and collection, including attorneys' fees, upon any indebtedness secured hereby and in such order as Mortgagee may determine. The collection of such rents, issues and profits or the entering upon and taking possession of the Mortgaged Property, or application thereof as aforesaid shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default. In addition, (and not as an election of remedies) upon occurrence of an Event of Default, Mortgagee may apply for a court order requiring Mortgagor to deposit all rents in the court registry or other depository as the court may direct pursuant and in accordance with Florida Statute 697.07, as amended. Mortgagor hereby consents to entry of such an order upon the sworn ex parte motion of Mortgagee that an Event of Default has occurred hereunder.

2.03 Directions to Tenants to Pay Rents to Mortgagee Mortgagor does hereby authorize and direct the tenants to pay such rents as may be due from time to time to Mortgagor, upon written demand of Mortgagee. Mortgagor covenants and agrees that an affidavit, certificate letter or written statement of any officer or agent of Mortgagor stating that rents are to be paid to Mortgagee shall be conclusive evidence of Mortgagees rights to collect such rents and the tenant upon payment of rents to Mortgagee shall be released from any and all liability to Mortgagor for the amount of such rents paid to Mortgagee.

2.04 Leases Affecting Mortgaged Property. Mortgagor will comply with and observe its obligations as landlord under all leases affecting the Mortgaged Property or any part thereof, whether now in existence or entered into in the future. Mortgagor will, if requested, furnish Mortgagee with executed copies of all leases now or hereafter created on the Mortgaged Property. All leases now or hereafter entered into will be in form and substance acceptable to Mortgagee. Other than may be reasonably necessary in the ordinary course of Mortgagor's business, Mortgagor will not modify, surrender, or terminate, either orally or in writing, any lease now existing or hereafter created upon the Mortgaged Property, nor will Mortgagor permit an assignment or sublease thereof without the express prior written consent of Mortgagee.

## ARTICLE 3
### SECURITY AGREEMENT

3.01 Creation of Security Interest. Mortgagor hereby grants to Mortgagee a security interest in the Building Equipment located on or at the Premises for the purpose of securing all obligations of Mortgagor set forth in this Mortgage. A security interest is granted Mortgagee in all rental and security deposits collected by Mortgagor from tenants in the premises. A security interest is also granted to Mortgagee in any sums held by Mortgagee or its loan servicing agent pursuant to the provisions of this Mortgage, or other collateral agreements or any agreements between Mortgagor, Mortgagee and any escrow agent holding loan proceeds pending disbursements as provided in such agreements where such sums are held for the benefit of Mortgagee.

3.02 Warranties, Representations and Covenants of Mortgagor. Mortgagor hereby warrants, represents and covenants as follows:

(a) The Building Equipment will be kept on or at the Premises and Mortgagor will not remove the Building Equipment from the Premises without the prior written consent of Mortgagee, except such portions or items of Building Equipment which are consumed or worn-out in ordinary usage, all of which shall be promptly replaced by Mortgagor with new items of equal or greater quality.

(b) At the request of Mortgagee, Mortgagor will join Mortgagee in executing one or more financing statements and renewals and will pay the cost of filing same in all public offices wherever necessary.

(c) This Section 3 of the Mortgage shall constitute a Security Agreement as that term is used in the Uniform Commercial Code of Florida.

## ARTICLE 4
### EVENT OF DEFAULT AND REMEDIES UPON DEFAULT

4.01 Event of Default. The term "Event of Default" wherever used in the Mortgage, shall mean any one or more of the following events:

(a) Failure by Mortgagor to pay within ten (10) days of when due and after the expiration of any grace period, any installments of principal or interest under the Note, or any other future advance secured by this Mortgage, or to pay any other sums to be paid by Mortgagor hereunder, or to make any deposits for taxes and assessments or insurance premiums due hereunder, if required.

(b) Other than as provided in paragraph (a) above, failure by Mortgagor to duly keep, perform and observe any other covenant, condition or agreement in this Mortgage, or any other instrument securing the Note or any other instrument or agreement collateral to the Note or executed in connection with the sums secured hereby, for a period of thirty (30) days after Mortgagee gives written notice specifying the breach, or the occurrence of an "Event of Default" as defined in such Note which has not been remedied within any cure period, if any, provided for therein.

(c) If Mortgagor or any present or future endorser, guarantor or surety of the Note shall file a voluntary petition in bankruptcy or be adjudicated a bankrupt or insolvent, or file any petition or answer seeking any reorganization,

arrangement, composition, readjustment, liquidation, assignment for the benefit of creditor's, receivership, wage earner's plan, dissolution or similar relief under any present or future Federal Bankruptcy Code or any other present or future applicable federal, state or other statute or law; or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Mortgagor or all or any part of the properties of Mortgagor or of any guarantor or endorser of the Note; or if within thirty (30) days after commencement of any proceeding against Mortgagor or any guarantor or endorser of the Note, seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, debtor relief or similar relief under any present or future Federal Bankruptcy Code, or of any other present or future federal, state or other statute or law, such proceeding shall not have been dismissed, or stayed on appeal or otherwise; or if, within the thirty (30) days after the appointment, without consent or acquiescence of Mortgagor or of any endorser or guarantor of the Note, any trustee, receiver, or liquidator of Mortgagor or any endorser or guarantor of the Note, or of all or any portion of the Mortgaged Property, such appointment shall not have been vacated or stayed on appeal or otherwise; or if within ten (10) days after the expiration of any such stay, such appointment shall not have been vacated.

(d) Any default under any mortgage superior or inferior to the Mortgage, or an event that but for the passage of time or giving of notice would constitute an event of default, even if such default is subsequently waived, except that in no manner should this provision be construed to allow such superior or subordinate mortgage to encumber the Mortgaged Property, except for the mortgages, if any, reflected in Exhibit "B" attached hereto.

(e) If foreclosure proceedings should be instituted on any mortgage inferior or superior to the Mortgage, or if any foreclosure proceeding is instituted on any lien of any kind which is not dismissed or transferred to a bond within twenty (20) days of the service of foreclosure proceedings on the Mortgagor.

(f) Any breach of any warranty or material untruth or any material representation of Mortgagor contained in the Note, this Mortgage or any other instrument securing or evidencing the Note, or in any other instrument given with respect to the sums secured hereby.

(g) If the Improvements on said Premises are not maintained in reasonably good repair.

(h) The transfer, sale, or conveyance of the Mortgaged Property or any interest therein without prior written consent of Mortgagee in violation of the provisions of Section 1.16. Mortgagor acknowledges that all subsequent purchasers of the Mortgaged Property or the interest in Mortgagor must be approved by Mortgagee, and Mortgagee's consent may be conditioned upon a change in interest rate and/or loan term, as well as payment of an assumption fee. Mortgagee, however, shall be under no obligation to approve any transfer.

(i) The further encumbering of the Mortgaged Property without prior written consent of Mortgagee.

(j) If Mortgagor, pursuant to Florida Statutes 697.04(1)(b), as amended from time to time, shall file an instrument of record limiting the maximum amount which may be secured by this Mortgage.

(k) Failure to provide Mortgagee a detailed current rent roll and annual statements of the property within ninety (90) days of the close of each calendar year; or to furnish such additional information, reports or statements relating to the operation and management of the Mortgaged Property as Mortgagee may from time to time reasonably require. Any such statement or statements shall be certified by Mortgagor to be correct.

4.02 Acceleration Upon Default, Additional Remedies. In the event one or more "Events of Default" as above provided shall occur, the remedies available to Mortgagee shall include, but not necessarily be limited to, any one or more of the following:

(a)    Mortgagee may declare the entire unpaid balance of the Note and all other obligations of Mortgagor secured hereby immediately due and payable without further notice.

(b)    Mortgagee may take immediate possession of the Mortgaged Property or any part thereof (which Mortgagor agrees to surrender to Mortgagee) and manage, control or lease same to such person or persons and exercise all rights granted pursuant to Section 2.02. The taking of possession under this Section 4.02 (b) shall not prevent concurrent or later proceedings for the foreclosure sale of the Mortgaged Property as provided elsewhere herein.

(c)    Mortgagee may apply, on ex parte motion to any court of competent jurisdiction, for the appointment of a receiver to take charge of, manage, preserve, protect, complete construction of and operate the Mortgaged Property and any business or businesses located thereon, to collect rents, issues, profits and income therefrom; to make all necessary and needed repairs to the Mortgaged Property; to pay all taxes and assessments against the Mortgaged Property and insurance premiums for insurance thereon; and after payment of the expense of the receivership, including reasonable attorneys' fees to the Mortgagee's attorney, and after compensation to the receiver for management and completion of the Mortgaged Property, to apply the net proceeds derived therefrom in reduction of the indebtedness secured hereby or in such manner as such court shall direct. All expenses, fees and compensation incurred pursuant to a receivership approved by such court, shall be secured by the lien of this Mortgage until paid.

(d)     Mortgagee shall have the right to foreclose this Mortgage and in case of sale in an action or proceeding to foreclose this Mortgage, Mortgagee shall have the right to sell the Mortgaged Property covered hereby in parts or as an entirety. It is intended hereby to give to Mortgagee the widest possible discretion permitted by law with respect to all aspects of any such sale or sales.

(e)     Without declaring the entire unpaid principal balance due, Mortgagee may foreclose only as to the sum past due without injury to this Mortgage or the displacement or impairment of the remainder of the lien thereof and at such foreclosure sale the Mortgaged Property shall be sold subject to all remaining items of indebtedness; and Mortgagee may again foreclose in the same manner as often as there may be any sum past due.

(f)     It shall also not be necessary that Mortgagee pay any Impositions, premiums or other charges regarding which Mortgagor is in default before Mortgagee may invoke its rights hereunder.

(g)     Exercise all other remedies available at law or equity in such order as Mortgagee may elect.

(h)     All such other remedies available to Mortgagee with respect to this Mortgage shall be cumulative and may be pursued concurrently or successively. No delay by Mortgagee in exercising any such remedy shall operate as a waiver thereof or preclude the exercise thereof during the continuance of that or any subsequent default.

(i)     The obtaining of a judgment or decree on the Note, whether in the State of Florida or elsewhere, shall not in anyway affect the lien of this Mortgage upon the Mortgaged Property covered hereby, and any judgment or decree so obtained shall be secured hereby to the same extent as said Note is now secured.

4.03  Repayment of Advances.  In the event of any expenditures of funds by Mortgagee to preserve the security of the lien referenced in this Mortgage, such as provisions for payment of taxes or insurance premiums or as otherwise provided for herein, Mortgagor shall repay Mortgagee for such expenditures, together with interest on said sums at the highest interest rate permitted by Florida law, within fifteen (15) days of notice to Mortgagor of such expenditures. These sums shall be secured by this Mortgage. The Mortgagee shall be the sole judge of the legality, validity and priority of any Imposition, obligation and insurance premium, of the necessity for paying such Imposition, obligation and insurance premium and of the amount necessary to be paid in satisfaction thereof.

4.04  Expenses.  Mortgagor shall pay, or reimburse Mortgagee for all costs, charges and expenses, including reasonable attorney's fees and paralegal charges, including appellate proceedings, and disbursements, and costs of abstracts of title incurred or paid by Mortgagee in any action, proceeding or dispute in which Mortgagee is made a party or appears as a party plaintiff or party defendant because of the failure of the Mortgagor promptly and fully to perform and comply with all conditions and covenants of this Mortgage and the Note secured hereby, including but not limited to, the foreclosure of this Mortgage, condemnation of all or part of the Mortgaged Property, or any action to protect the security thereof. All costs, charges and expenses so incurred by Mortgagee shall become immediately due and payable whether or not there be notice, demand, attempt to collect or suit pending, together with interest thereon at the highest interest rate permitted by Florida law from the date incurred until paid by Mortgagor. The amounts so paid or incurred by Mortgagee shall be secured by the lien of this Mortgage. This Mortgage shall also secure all fees, charges, costs, reimbursements and other sums, if any, that are provided for in the Note or other agreement between Mortgagor and Mortgagee, and would be due by Mortgagor to Mortgagee upon prepayment of the Note, whether such prepayment is voluntary or arises from Mortgagee's acceleration of the Note due to a default thereunder or hereunder.

## ARTICLE 5
### MISCELLANEOUS PROVISIONS

5.01  Future Advances/Securing Other Obligations.  This Mortgage is given to secure not only the existing indebtedness of the Mortgagor to the Mortgagee evidenced by the Note secured hereby, but also such future advances up to an additional _____ DOLLARS ($_____.00) (or if the preceding blank is not computed then an amount equal to two hundred [200%] percent of the principal amount originally secured hereby shall apply) as are made within twenty (20) years from the date hereof, plus interest thereon, and any disbursements made by Mortgagee for payment of taxes, insurance or other liens on the property

encumbered by this Mortgage, with interest on such disbursements, which advances shall be secured hereby to the same extent as if such future advances were made this date. The total amount of indebtedness secured hereby may increase or decrease from time to time. This Mortgage shall also secure any sums due pursuant to the Note as a charge, fee or premium expressly provided for in the Note in the event of acceleration of the Note due to a default therein or a prepayment of such Note. The provisions of this Section shall not be construed to imply any obligation on Mortgagee to make any future advances, it being the intention of the parties that any future advances shall be solely at the discretion and option of Mortgagee. Any reference to "Note" in this Mortgage shall be construed to reference any future advances made pursuant to this Section.

5.02   Construction Loan Agreement.   If this Mortgage is in connection with construction loan financing, then this Mortgage is subject to the Construction Loan Agreement dated of even date herewith between the Mortgagor and the Mortgagee, an executed copy of which is in the possession of the Mortgagee and is incorporated herein by reference and made a part hereof; any default by Mortgagor under said agreement shall constitute an Event of Default under this Mortgage.

5.03   Ownership by a Limited Liability Company.   So long as the Mortgaged Property shall be owned or held by a Limited Liability Company , such Limited Liability Company shall at all times maintain its existence and shall be fully authorized to do business in the State of Florida and shall maintain in the State of Florida a duly authorized registered agent for service of process. Failure to comply with such obligations shall be a default under this Mortgage.

5.04   Statements by Mortgagor.   Mortgagor, within three (3) business days after request in person or ten (10) days after request by mail, will furnish to Mortgagee or any person, corporation or  firm designated by Mortgagee, a duly acknowledged written statement setting forth the amount of the debt secured by this Mortgage and stating either that no offsets or defenses exist against such debt, or, if such offsets or defenses are alleged to exist, full information with respect to such alleged offsets and/or defenses.

5.05   Survival of Warranties.   All representations, warranties and covenants of Mortgagor contained herein or incorporated by reference shall survive the close of escrow and funding of the loan evidenced by the Note and shall remain continuing obligations, warranties and representations of Mortgagor during any time when any portion of the obligations secured by this Mortgage remain outstanding.

5.06   Successors and Assigns.   The provisions hereof shall be binding upon and shall inure to the benefit of Mortgagor, its successors and assigns (including without limitation subsequent owners of the Premises) and shall be binding upon and shall inure to the benefit of Mortgagee, its successors and assigns and any future holder of the Note hereby secured, and any successors or assigns of any future holder of the Note.

5.07   Notices.   All notices, demands and requests given by either party hereto to the other party shall be in writing. All notices, demands and requests by one party to the other shall be deemed to have been properly given as herein required if sent by (i) United States registered or certified mail, postage prepaid, or (ii) delivered in person, or (iii) sent by overnight courier to the address indicated on page 1 hereof or at such other address as a party may from time to time designate by written notice to the other, any notice delivered to the address set forth in page 1 shall be deemed delivered if delivery thereof is rejected or refused at the address provided.

5.08   Modifications in Writing.   This Mortgage may not be changed, terminated or modified orally or in any other manner than by an instrument in writing signed by the party against whom enforcement is sought.

5.09   Captions.   The captions or headings at the beginning of each Section hereof are for the convenience of the parties and are not a part of this Mortgage.

5.10   Abstract Property of Mortgagee.   The abstract or abstracts of title covering the Mortgaged Property, if any, shall at all times, during the life of this Mortgage, remain in possession of the Mortgagee and in the event the foreclosure of this Mortgage or other transfer of title to the Mortgaged Property in extinguishment of the indebtedness secured hereby, all right, title and interest of Mortgagor in and to any such abstracts of title shall pass to the purchaser or grantee.

5.11     Maximum rate of interest.   In no event shall all charges in the nature of interest charged or taken on this Mortgage or the Note exceed the maximum allowed by law and in the event such charges cause the interest to exceed said maximum allowed by law, such interest shall be recalculated, and such excess shall be credited to principal, it being the intent of the parties that under no circumstances shall the Mortgagor be required to pay any charges in the nature of interest in excess of the maximum rate allowed by law.

5.12     Further Assurances.       Mortgagor will execute and deliver promptly to Mortgagee on demand at any time or times hereafter, any and all further instruments reasonably required by Mortgagee to carry-out the provisions of this Mortgage. Mortgagor will, without limitation upon the generality of the foregoing, at any and all times at its expense, execute, acknowledge, deliver, file and/or record, refile and/or re-record, all and every such further acts, deeds, powers of attorney, assignment of accounts, conveyances, mortgages security instruments, documents and financing assurances in law, and will deposit with Mortgagee any certificates of title issuable with respect to any property and notation thereof the security interest hereunder, as Mortgagee shall reasonably require for the better assuring, conveying, pledging, transferring, mortgaging, assigning, and confirming unto Mortgagee all and singular the hereditaments and premises, estates and property hereby, or by subsequent or collateral instruments, conveyed, pledged, transferred or assigned, or intended to be, and for perfecting the security interest of Mortgagee in the Mortgaged Property and other items of security and collateral now or hereafter held by Mortgagee pursuant to this

Mortgage, and pay any and all requisite stamp taxes, recording charges, filing fees, intangible taxes and other taxes legally due and required thereon.

     5.13    Title Insurance Policy/Survey/ Appraisal. If requested, Mortgagor will provide Mortgagee with a mortgage insurance policy in the face amount of the Note, issued by a title company acceptable to Mortgagee and insuring this Mortgage as a valid mortgage, and subject only to such exceptions, if any, which are acceptable to Mortgagee, together with, if requested, a current survey of the Premises encumbered by this Mortgage, prepared and certified by a registered surveyor or engineer showing access to the Property and no condition which would prevent title to the Premises from being good, marketable and insurable as a fee simple title. Mortgagee may be required by rule or regulation to obtain one or more appraisals of the Mortgaged Property and if so required, Mortgagor agrees to reimburse Mortgagee for the reasonable costs for such appraisal.

     5.14    Costs.

     (a)    Mortgagor will pay all costs and expenses reasonably incurred by Mortgagee in the preparation and recording of this Mortgage and all ancillary documents executed in connection therewith, or with the loan evidenced by the Note, including without limitation, any intangible tax, documentary stamp tax, recording and filing fees and premiums for any required mortgagee title insurance policy, cost of any required survey, as well as the attorney's fees for Mortgagee's counsel.

     (b)    Mortgagor agrees that in the event that the Florida Department of Revenue, or any other governmental agency, should determine at any time that additional documentary stamp taxes or intangible taxes are required incident to the Note, this Mortgage or any additional loans secured hereby, Mortgagor shall agree to indemnify and reimburse Mortgagee forthwith for the costs of any additional documentary stamp taxes and/or intangible taxes, together with any interest or penalty that Mortgagee may be called upon to pay. This indemnity obligation shall survive repayment of the Note and any and all other obligations of Mortgagor secured by this Mortgage.

     (c)    In the event that Mortgagor shall fail to pay any such additional documentary stamp taxes and/or intangible taxes, same shall constitute an Event of Default hereunder and Mortgagee may pay same, without waiving or affecting any of Mortgagee's other rights and remedies set forth herein. Any such disbursements made by Mortgagee shall bear interest from the date thereof at the highest rate authorized by law, and the Mortgage shall secure repayment of any such disbursements, together with interest accrued thereon.

     5.15  Invalid Provisions to Affect No Others. In case any one or more of the covenants, agreements, terms, or provisions contained in this Mortgage or in the Note shall be held or found invalid, illegal, or unenforceable in any respect, the validity of the remaining covenants, agreements, terms, or provisions contained herein and in the Note shall be in no way affected, prejudiced, or disturbed thereby.

     5.16  Governing Law and Construction of Clauses. This Mortgage shall be governed and construed by the laws of the State of Florida. No act of Mortgagee shall be construed as an election to proceed under any one provision of the Mortgage or of the applicable statutes of the State of Florida to the exclusion of any other such provision, anything herein or otherwise to the contrary notwithstanding.

     5.17 Handicapped Access.

     (a)    Mortgagor agrees that the Premises shall at all times strictly comply to the extent applicable with the requirements of the American with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988 (if applicable), all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the American with disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "Access Laws").

     (b)    Notwithstanding any provisions set forth herein or in any other document regarding Mortgagee's approval of alterations of the Premises, Mortgagor shall not alter the Premises in any manner which would increase Mortgagor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Mortgagee. The foregoing shall apply to tenant improvements constructed by Mortgagor or by any of its tenants. Mortgagee may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other person acceptable to Mortgagee.

     (c)    Mortgagor agrees to give prompt notice to Mortgagee of the receipt by Mortgagor of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

     5.18  Time of Essence. Time is of the essence of this Mortgage. The undersigned Mortgagor hereby represents and certifies that the extension of credit secured by this mortgage is exempt from any and all provisions of the Federal Consumer Credit Protection Act (Truth-in-Lending Act) and Regulation "Z" of the Board of Governors of the Federal Reserve System, because it is an organization fully excluded therefrom or because the loan and credit represented by this Mortgage and the note secured hereby is only for business or commercial purposes of the Mortgagor and the proceeds of the loan are not being used for personal family or household purposes.

5.19 _Waiver._ No waiver of any covenant herein or in the obligation secured hereby shall at any time hereafter be held to be a waiver of any of the other terms hereof or of the Note secured hereby, or future waiver of the same covenant.

5.20 _Gender, Etc._ The use of any gender shall include all other genders. The singular shall include the plural.

5.21 _Mortgage Riders._ If any Rider is attached to this Mortgage and recorded together with this Mortgage and signed by Mortgagor, it shall be deemed to be incorporated herein and to be fully binding upon Mortgagor as though it were a part of the original Mortgage.

5.22 _Waiver of Jury Trial._ MORTGAGEE AND MORTGAGOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS MORTGAGE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTION OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE MORTGAGEE MAKING THE LOAN TO MORTGAGOR.

IN WITNESS WHEREOF, Mortgagor has hereunto set its hand and seal all done as of the day and year first hereinbefore written.

Signed, sealed and delivered
in the presence of:

Print Name: Rosa I. Liriano

Print Name:

HALLANDALE BEACH BUSINESS CENTER, L.L.C., a Florida limited liability company

BY:
Name: Richard Shan
Title: Co-Manager

By:
Name: Jodi Tartell
Title: Co-Manager

STATE OF FLORIDA:
COUNTY OF MIAMI-DADE:

The foregoing instrument was acknowledged before me, this _13th_ day of _December_, 2006, by Richard Shan, and Jodi Tartell as Co-Managers of **HALLANDALE BEACH BUSINESS CENTER, L.L.C.,** a Florida limited liability company on behalf of the company. ~~They are personally known to me~~ or have produced _____ as identification.

My Commission Expires:

Notary Public -
Print Name: Rosa I. Liriano
Commission No:

Rosa I. Liriano
Commission #DD256507
Expires: Nov 07, 2007
Bonded Thru
Atlantic Bonding Co., Inc.

# Exhibit "D"

THIS INSTRUMENT WAS PREPARED
BY: Joel A. Savitt, Esq.
Joel A. Savitt, P.A.
20801 Biscayne Boulevard,
Suite 506
Aventura, Florida 33180

**DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES HAVE BEEN PAID IN FULL ON THE MORTGAGE BEING MODIFIED HEREBY RECORDED IN OFFICIAL RECORDS BOOK 43285, PAGE 1443, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.**

### NOTE AND MORTGAGE MODIFICATION AGREEMENT

**THIS NOTE AND MORTGAGE MODIFICATION AGREEMENT** (hereinafter referred to as "Agreement") is made and entered into on this 3rd day of November, 2009, by and between **IG Family Limited Liability Limited Partnership, LLLP**, a Florida limited liability limited partnership (hereinafter referred to as "Lender"), whose address is 4040 Island Estates, Aventura, Florida 33160, and **Hallandale Beach Business Center, L.L.C.**, a Florida limited liability company (hereinafter referred to as "Borrower").

**WHEREAS**, Borrower executed and delivered to Lender that Promissory Note (the " Note") dated December 3rd, 2006, in the original principal amount of $3,400,000.00; and

**WHEREAS**, the Note is secured by a Mortgage and Security Agreement (the "Mortgage") dated December 3rd, 2006, and recorded on December 18th, 2006, in Official Records Book 43285, Page 1443, and further secured by the Assignment of Leases and Rents recorded on December 18th, 2006, in Official Records Book 43285, at Page 1455, and the UCC-1 Financing Statement recorded in Official Records Book 43285, at Page 1459, all of the Public Records of Broward County, Florida, which Mortgage encumbers real estate and property described on Exhibit "A" attached (collectively, the "Mortgage Property"); and

**WHEREAS**, the Lender and Borrower , at the request of Borrower, have agreed to modify the Note and Mortgage as hereinafter provided; and

**NOW THEREFORE**, for and in consideration of the premises and other good and valuable considerations, receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

1.	The foregoing recitals are true and correct and incorporated herein by reference.

2.	The Mortgage and Note are hereby amended to provide that the principal balance of the Note shall be payable in full on December 3rd, 2012, together with any accrued and unpaid interest.

3.	The Note and Mortgage are also hereby amended to provide for a fixed interest rate of three and a half percent (3.5%) per annum effective as of November 3rd, 2009.

4.	Borrower hereby confirms and covenants that it has no claims or defenses against the Lender that could give rise to any defense, off-set or counterclaim in connection with

1

the payment of the Note or the enforcement of the Mortgage, as amended hereby, or against the Lender.

5.     Borrower certifies that it is the fee simple owner of the absolute title to the real property described herein, which Borrower has agreed to provide Lender as collateral and which Lender shall continue to encumber said property by the lien in operation and effect of the Mortgage as modified herein.

6.     Borrower certifies that there are no liens or claims against the real property which would take precedence over the Note and Mortgage, or any other documents executed directly or indirectly in connection with the loan.

7.     Borrower acknowledges that the outstanding principal balance of the Note is the absolute and unconditional obligation of the Borrower, and that the Note and Mortgage are legally valid and binding, fully enforceable in accordance with the terms thereof and remain in full force and effect, as modified hereby.

8.     Except as modified hereby, all the terms and conditions of the Note and Mortgage, as well as all other documents and instruments executed and delivered by Borrower to Lender in connection therewith, are hereby ratified, affirmed and approved in all respects and shall remain in full force and effect.

9.     Borrower and Lender acknowledge, agree and express their intentions that this Agreement shall not constitute a novation and will in no way adversely affect the lien of any of the loan documents. The parties herein acknowledge that this Agreement is to be construed as a modification of the current outstanding obligation. In the event that this Agreement, or any part thereof, is construed by a court of competent jurisdiction as operating to affect the lien priority of any of the loan documents over the claims which would otherwise be subordinate thereto, then to the extent that third parties acquiring an interest in such property between the time of execution of the loan documents and this Agreement, or such portion hereof as is so construed, will be void and of no force and effect, and this Agreement will constitute, as to that portion, a subordinate lien on the collateral, incorporating by reference the terms of the loan documents, and which loan documents then will be enforced pursuant to the terms therein contained, independent of this Agreement, provided, however, that notwithstanding the foregoing, the parties hereto, as between themselves, will be bound by all terms and conditions hereof until all indebtedness owing from the Borrower to the Lender has been paid in full.

10.     Borrower hereby represents and warrants to Lender that in the event any documentary stamp tax, intangible or other taxes, fees or other charges and penalties and interest thereon (herein collectively referred to as "Taxes"), are due or become due by reason of the transactions described in this instrument, Borrower agrees to pay any of such Taxes due immediately upon notice that any such Taxes are due and payable notwithstanding that Borrower may be contesting same. Borrower further agrees that failure to immediately pay any such Taxes shall be a default under the Mortgage, entitling the Lender to all remedies for default under the Mortgage, or at the option of the Lender, the Lender can pay any such Taxes when due (notwithstanding that Lender may be contesting same) and all sums paid by Lender, together with interest thereon at the highest rate permitted by law, shall upon payment thereof, be due and payable from Borrower and

2

secured by the Mortgage, in addition to all other indebtedness secured thereby. Nothing herein contained shall be deemed an obligation on the part of the Lender to pay any such Taxes.

11.    This instrument shall be construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals this 30 $^{TH}$ day of November, 2009.

Signed, Sealed and Delivered in
the Presence of

_____
Print Name: Witness

_____
Print Name: Witness

_____
Print Name: Witness

_____
Print Name: Witness

Gwenaelle Romain

IG Family Limited Liability Limited Partnership, LLLP, a Florida limited liability limited partnership,

By: _____
Irving Geduld, President

Hallandale Beach Business Center, L.L.C., a Florida limited liability company

By: _____
Name: Richard Shan, Co-Manager

By: _____
Name: Jodi Tartell, Co-Manager

3

STATE OF FLORIDA       )
COUNTY OF MIAMI-DADE  )

      The foregoing instrument was acknowledged before me on this 30th day of November, 2009, by Irwin Geduld, as President of IG Family Limited Liability Limited Partnership, LLLP, a Florida limited liability limited partnership, who is personally known to me, and who did not take an oath, and he acknowledged executing the same freely and voluntarily under the authority vested in him by said partnership.



Name: Madeleine Tirado
NOTARY PUBLIC, STATE OF FLORIDA
Commission Expiration Date:_____
Commission Number:_____

> MADELEINE TIRADO
> MY COMMISSION # DD 621729
> EXPIRES: December 21, 2010
> Bonded Thru Notary Public Underwriters

STATE OF FLORIDA       )
COUNTY OF MIAMI-DADE  )

      The foregoing instrument was acknowledged before me on this 30th day of November, 2009, by Richard Shan and Jodi Tartell, who are Co-Managers of Hallandale Beach Business Center, L.L.C., a Florida limited liability company, and they acknowledged executing the same freely and voluntarily under the authority vested in them by said company.



Name: Madeleine Tirado
NOTARY PUBLIC, STATE OF FLORIDA
Commission Expiration Date:_____
Commission Number:_____

> MADELEINE TIRADO
> MY COMMISSION # DD 621729
> EXPIRES: December 21, 2010
> Bonded Thru Notary Public Underwriters

4

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

Lots 1 through 6, and Lot 19, less the North 10 feet, and Lot 20, Block 30, of the Plat of the TOWN OF HALLANDALE, as Recorded in Plat Book "B", Page 13 of the Public Records of Miami-Dade County, Florida, said land situate, lying and being in Broward County, Florida.

# Exhibit "E"

# PROMISSORY NOTE

$3,536,054.32

June _____, 2013
Aventura, Florida

**FOR VALUE RECEIVED**, the undersigned (hereinafter referred to as the "Maker") promises to pay to **THE JOAN GEDULD 2002 FAMILY IRREVOCABLE TRUST DATED JUNE 11th, 2002 FBO JODI TARTELL**, (hereinafter referred to as the "Payee"), or order, at its principal place of business at 4040 Island Estates, Aventura, FL 33160, or at such other place as may be designated in writing by the holder of this Note, the principal sum of **THREE MILLION FIVE HUNDRED THIRTY SIX THOUSAND FIFTY FOUR ($3,536,054.32) DOLLARS**, with interest thereon from date at the rate described below. The undersigned hereby promises to pay principal and interest as follows:

Commencing on the first day of the month following the execution of this Note monthly payments of interest only shall be payable on the principal balance from time to time outstanding. Interest shall accrue at the One (1) month Libor Rate plus one (3%) percent per annum, computed on a daily basis and based on a 360 day year and number of days elapsed. The calculation date shall be the first date of each month and payments shall be made within ten (10) days thereafter. The total annual percentage rate of interest herein charged shall not exceed the maximum rate of interest permitted by the usury laws of the State of Florida or the United States, from time to time during the term of this Note, whichever is greater. All monthly payments shall be first applied to interest at the rate set forth above and the balance of the monthly payments shall be applied in reduction of principal. In no event shall the interest here charged be less than five percent (5.00%) per annum.

The principal balance of this note shall be payable in full on June _____, 2015, together with any accrued and unpaid interest.

Should the Maker hereof (or the Endorsers or any Guarantor hereof) fail to pay the installment of interest or principal due on this Note by the tenth (10th) day from the due date, then the Maker agrees to pay a late charge of five (5%) per cent of the sum overdue, as a handling charge for the Maker's failure to make prompt payment.

If any installment of principal or interest or any part thereof is not paid within ten (10) days from the date due or upon occurrence of any one or more events of default specified in any agreement, mortgage or security agreement referred to in this Note which has not been remedied within the time specified therein, if any, or in the event of any default under any guaranty, all amounts then remaining unpaid on this Note may be declared to be immediately due and payable.

The Maker, Endorsers, guarantors, sureties and all other parties liable for the payment of any sum or sums due or to become due under the terms of this Note waive presentment, protest and demand, and notice of protest, demand and dishonor, and non-payment of this Note, and consent that the holder hereof shall have the right, without notice, to deal in anyway at any time with any party hereto, or to grant any extension or extensions of time for payment of any of the indebtedness or any other indulgences or forbearances whatsoever, or may release any of the security for this note or guarantors of this Note without in anyway affecting the liability of any other party for the payment of the Note.

PLF/DEF R.Shan

EXHIBIT

DATE 1/24/ SRPTR UE

*Orange Legal*

This Note shall be deemed to reflect the principal amount actually outstanding, even though the face amount may be in excess of the principal amount outstanding from time to time.

Interest hereunder shall be charged only on the sums advanced from the date of advance to the date of repayment, and interest from the date of this Note to the date of advance is waived. The Maker hereof does not intend or expect to pay, nor does the Payee intend or expect to charge, accept or collect any interest which, when added to any commitment fee or any other charge upon the principal, shall be in excess of the highest lawful rate allowable under the laws of the State of Florida or the United States of America, whichever is higher or unlimited. Should acceleration, prepayment or any other charges upon the principal or any portion thereof result in the computation or earning of interest in excess of the highest lawful rate allowable under the laws of the State of Florida or the United States of America, whichever is higher or unlimited, any and all such excess is hereby waived and shall be credited to the outstanding principal balance or returned to the Maker.

While in default and after maturity of this Note, either by its terms or acceleration, interest shall accrue and be payable at the highest rate of interest permitted by the usury laws of the State of Florida and of the United States, whichever is higher or unlimited, from the due date until paid. The post judgment rate of interest for any judgment entered pursuant to this Note or any other loan document executed in connection herewith shall be the greater of: (i) the default rate set forth in this Note; or (ii) the rate established by the Comptroller of the State of Florida pursuant to Section 55.03 (1), Florida Statutes.

No delay on the part of the Payee in exercising any power or right hereunder shall operate as a waiver thereof; nor shall any single exercise or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right; nor shall the Payee be liable for exercising or failure to exercise any such power or right hereunder. The rights or remedies herein expressly specified are cumulative and not exclusive remedies which the Payee may have.

This Note is secured by a mortgage and security agreement executed by the Maker hereof constituting a lien on real estate and personal property. It is expressly agreed that all of the covenants, conditions and agreements contained in the mortgage and security agreement executed in connection herewith are hereby made part of this Note.

This Note will be considered in default upon any default under the terms of the mortgage or security agreement securing this Note or any other agreement executed by Maker in conjunction with this Note. In such event, the Payee may at its election declare the Note due and payable. Failure at any time to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.

In addition to any other Event provided in this Note, the Maker will be in default upon occurrence of any of the following: (a) any creditor tries to take any of Maker's property on or in which Payee has a lien or security interest (this includes a garnishment of any of Maker's accounts with Payee) and (b) the issuance of any tax levy or lien against Maker or Maker's failure to pay, withhold, collect or remit any tax when assessed or due.

This Note shall be governed, construed and interpreted in accordance with the internal laws of the State of Florida without giving effect to principles of conflict laws.

STAT CONF 000002

Should it become necessary to collect this Note through an attorney, all parties hereto, whether Maker, Endorser or Guarantors, each severally agrees to pay all costs of collecting this Note, including reasonable attorneys' fees, plus costs incurred in enforcing this Note and recovery of all amounts owing by Payee whether collected by suit including in trial, on appeal, in Bankruptcy proceedings or otherwise.

Maker agrees upon the request of Payee to pay all such taxes, duties and other charges in addition to principal and interest on this Note including all documentary stamp taxes and intangible taxes as are from time to time payable or assessed on this Note but exclusive of United States income taxes and Florida income taxes.

This Note may not be terminated orally, but only by discharge in writing and signed by the party who is the owner and holder of this Note at the time enforcement of any discharge is sought.

The Payee may so transfer this Note and/or any of its rights and power hereunder, and in the event of such transfer, the transferee hereof or of such rights and powers shall have the same rights and remedies hereunder as if originally named herein in place of the Payee.

This Note and the provisions hereof are to be binding upon the heirs, executors, administrators, assigns or successors of Maker and Payee.

PAYEE AND MAKER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A JURY TRIAL IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE NOTE, THE MORTGAGE OR ANY OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON. THIS SECTION IS A MATERIAL INDUCEMENT FOR THE PAYEE TO EXTEND THE LOAN EVIDENCED BY THIS NOTE.

HALLANDALE BEACH BUSINESS CENTER, L.L.C., a Florida limited liability company

By: _____
   Name: Richard Shan
   Title:  Co-Manager


By: _____
   Name: Jodi Tartell
   Title:  Co-Manager

STAT CONF 000003

# Exhibit "F"

**HBBC**

| Date | Type | Amount | Allocation to Loan | Allocation to Payable |
|---|---|---|---|---|
| 1/13/2012 | Transfer to Shanco Const | 20,000.00 | | 20,000.00 |
| 2/9/2012 | Transfer to Shanco Const | 25,000.00 | | 25,000.00 |
| 3/30/2012 | Transfer from Shanco Const | (15,000.00) | | (15,000.00) |
| 5/10/2012 | Transfer to Shanco Const | 25,000.00 | | 25,000.00 |
| 8/21/2012 | Transfer to Shanco Const | 37,000.00 | | 37,000.00 |
| 9/10/2012 | Transfer to Shanco Const | 25,000.00 | | 25,000.00 |
| 5/10/2013 | Transfer to Shanco Const | 25,000.00 | 25,000.00 | - |
| 6/6/2013 | Transfer to Shanco Const | 25,000.00 | | 25,000.00 |
| 7/3/2013 | Transfer to Shanco Const | 25,000.00 | | 25,000.00 |
| 7/26/2013 | Transfer to Shanco Const | 25,000.00 | 25,000.00 | |
| 9/9/2013 | Transfer to Shanco Const | 50,000.00 | 50,000.00 | |
| 11/12/2013 | Transfer to Shanco Const | 50,000.00 | 50,000.00 | |
| 1/1/2014 | Transfer to Shanco Const | 40,000.00 | | 40,000.00 |
| 6/6/2014 | Transfer to Shanco Const | 75,000.00 | - | 75,000.00 |
| 7/14/2014 | Transfer to Shanco Const | 60,000.00 | 60,000.00 | |
| | | 492,000.00 | 210,000.00 | 282,000.00 |

**2648 Van Buren**

| Date | Type | Amount | Allocation to Loan | Allocation to Payable |
|---|---|---|---|---|
| 3/30/2012 | Transfer from Shanco Const | (9,500.00) | | (9,500.00) |
| 7/4/2013 | Transfer to Shanco Const | 18,838.73 | | 18,838.73 |
| 8/8/2013 | Transfer to Shanco Const | 20,000.00 | 20,000.00 | |
| 9/9/2013 | Transfer to Shanco Const | 20,000.00 | 7,840.09 | 12,159.91 |
| 11/21/2013 | Transfer to Shanco Const | 20,000.00 | 20,000.00 | |
| 1/17/2014 | Transfer to Shanco Const | 20,000.00 | | 20,000.00 |
| | | 89,338.73 | 47,840.09 | 41,498.64 |

**Hallandale Village**

| Date | Type | Amount | Allocation to Loan | Allocation to Payable |
|---|---|---|---|---|
| 3/30/2012 | Transfer to Shanco Const | 24,000.00 | | 24,000.00 |
| 7/13/2012 | Transfer to Shanco Const | 16,081.85 | | 16,081.85 |
| 1/10/2014 | Transfer to Shanco Const | 15,000.00 | | 15,000.00 |
| 7/15/2014 | Transfer to Shanco Const | 15,000.00 | | 15,000.00 |
| | | 70,081.85 | - | 70,081.85 |

# Hallanadle Beach Business Center LLC
## Vender Detail
### 12-1-2012 thru 12-31-2014

| Type | Num | Account | Amount | Balance |
|------|-----|---------|--------|---------|
| **Shanco Construction Company** | | | | 4,016.64 |
| Check | | Accounts Payable | -20,000.00 | -15,983.36 |
| Check | | Accounts Payable | -25,000.00 | -40,983.36 |
| Deposit | | Accounts Payable | 15,000.00 | -25,983.36 |
| Check | | Accounts Payable | -25,000.00 | -50,983.36 |
| Bill | 432 | Accounts Payable | 41,979.60 | -9,003.76 |
| Check | 4 | Accounts Payable | -37,000.00 | -46,003.76 |
| Deposit | | Accounts Payable | 25,000.00 | -21,003.76 |
| Bill | 443 | Accounts Payable | 31,766.70 | 10,762.94 |
| Bill Pmt -Check | online | Accounts Payable | -10,762.94 | 0.00 |
| Check | | Accounts Payable | -25,000.00 | -25,000.00 |
| Check | 8 | Accounts Payable | | -25,000.00 |
| Check | 9 | Accounts Payable | -25,000.00 | -50,000.00 |
| Bill | 454 | Accounts Payable | 23,519.78 | -26,480.22 |
| Bill | 472 | Accounts Payable | 79,533.48 | 53,053.26 |
| Check | | Accounts Payable | -40,000.00 | 13,053.26 |
| Check | | Accounts Payable | -75,000.00 | -61,946.74 |
| Bill | 489 | Accounts Payable | 59,020.14 | -2,926.60 |
| Bill | 493 | Accounts Payable | 12,919.78 | 9,993.18 |
| Bill Pmt -Check | online | Accounts Payable | -9,993.18 | 0.00 |
| Deposit | | Accounts Payable | 8,000.00 | 8,000.00 |
| Total Shanco Construction Company | | | 3,983.36 | 8,000.00 |
| **TOTAL** | | | **3,983.36** | **8,000.00** |

## Hallandale Village LLC
## Transaction List by Vendor
### January 1, 2012 through December 3, 2014

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| **Shanco Construction Company** | | | | | | | |
| Check | 03/30/2012 | | mortgage inte... | Colonial Bank | X | Accounts Pay... | -24,000.00 |
| Check | 07/13/2012 | | mortgage inte... | Colonial Bank | X | 9310 Interest ... | -16,081.85 |
| Bill | 12/30/2012 | 445 | | Accounts Payable | | -SPLIT- | -12,004.91 |
| Bill | 12/30/2013 | 475 | | Accounts Payable | | -SPLIT- | -2,371.78 |
| Check | 01/10/2014 | | | Colonial Bank | X | Accounts Pay... | -15,000.00 |
| Check | 01/10/2014 | | | Colonial Bank | | Accounts Pay... | -15,000.00 |
| Bill | 08/11/2014 | 491 | | Accounts Payable | | -SPLIT- | -3,768.69 |

## 2648 Van Buren LLC
## Transactions by Account
### As of December 31, 2014

**Accrual Basis**

| Type | Date | Num | Name | Memo | Class | Clr | Split | Amount | Balance |
|------|------|-----|------|------|-------|-----|-------|--------|---------|
| **BRSM - Shareholder Loan** | | | | | | | | | 116,688.69 |
| Check | 08/08/2013 | | Shanco Constructio... | | | | Colonial Bank | -20,000.00 | 96,688.69 |
| Check | 09/09/2013 | | Shanco Constructio... | | | | Colonial Bank | -7,840.09 | 88,848.60 |
| Check | 11/21/2013 | | Shanco Constructio... | | | | Colonial Bank | -20,000.00 | 68,848.60 |
| Total BRSM - Shareholder Loan | | | | | | | | -47,840.09 | 68,848.60 |
| **TOTAL** | | | | | | | | **-47,840.09** | **68,848.60** |

**1:37 PM**

**12/03/14**

**Accrual Basis**

**Hallanadle Beach Business Center LLC**
# Transactions by Account
### As of December 3, 2014

| Type | Date | Num | Name | Memo | Class | Clr | Split | Amount | Balance |
|------|------|-----|------|------|-------|-----|-------|--------|---------|
| **BRSM - Shareholder Loan** | | | | | | | | | 427,743.00 |
| Check | 05/29/2013 | 7 | BRSM Investments ... | Reduction of Shareholde... | | | Colonial Bank | -25,000.00 | 402,743.00 |
| Check | 07/26/2013 | | BRSM Investments ... | Reduction of Shareholde... | | | Colonial Bank | -25,000.00 | 377,743.00 |
| Check | 09/09/2013 | | BRSM Investments ... | Reduction of Shareholde... | | | Colonial Bank | -50,000.00 | 327,743.00 |
| Check | 11/12/2013 | | BRSM Investments ... | | | | Colonial Bank | -50,000.00 | 277,743.00 |
| Check | 07/10/2014 | | BRSM Investments ... | | | | Colonial Bank | -60,000.00 | 217,743.00 |
| Total BRSM - Shareholder Loan | | | | | | | | -210,000.00 | 217,743.00 |
| **TOTAL** | | | | | | | | **-210,000.00** | **217,743.00** |

## 2648 Van Buren LLC
## Transaction List by Vendor
### January 1, 2012 through December 3, 2014

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| **Shanco Construction Company** | | | | | | | |
| Deposit | 03/30/2012 | | Deposit | Colonial Bank | X | Accounts Pay... | 9,500.00 |
| Bill | 06/07/2012 | 434 | | Accounts Payable | | -SPLIT- | -13,663.00 |
| Bill | 12/30/2012 | 444 | | Accounts Payable | | -SPLIT- | -30,702.72 |
| Bill | 07/07/2013 | 455 | | Accounts Payable | | -SPLIT- | -18,838.73 |
| Bill Pmt -Check | 07/07/2013 | online | | Colonial Bank | X | Accounts Pay... | -18,838.73 |
| Check | 08/08/2013 | | | Colonial Bank | X | Richard Shan ... | -20,000.00 |
| Check | 09/09/2013 | | | Colonial Bank | X | -SPLIT- | -20,000.00 |
| Check | 11/21/2013 | | | Colonial Bank | X | Richard Shan ... | -20,000.00 |
| Bill | 12/30/2013 | 473 | | Accounts Payable | | -SPLIT- | -21,505.11 |
| Check | 01/17/2014 | | | Colonial Bank | X | Accounts Pay... | -20,000.00 |
| Bill | 08/01/2014 | 488 | | Accounts Payable | | -SPLIT- | -10,654.80 |